# EXHIBIT A

```
1              IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DIVISION OF CALIFORNIA

3   JACALYN ROBBINS,                    )
                                        )
4                 Plaintiff,            )
                                        )
5   vs.                                 ) No. 16-cv-4732-LHK
                                        )
6   CITIMORTGAGE, INC.; EXPERIAN        )
    INFORMATION SOLUTIONS, INC.; EQUIFAX )
7   INFORMATION SERVICES, LLC; and      )
    TRANSUNION, LLC,                    )
8                                       )
                  Defendants.           )
9   _____)

10

11

12                      DEPOSITION OF

13                     JACALYN ROBBINS

14                     June 28, 2017

15                      10:58 a.m.

16

17          Three Embarcadero Center, 7th Floor

18              San Francisco, California

19

20

21

22

23  REPORTED BY:

24  Dawn A. Stark

25  CSR No. 7847
```

```
 1     A.    "Took out a loan"?  Could you be more specific?

 2     Q.    You took out a mortgage --

 3     A.    Yes.

 4     Q.    -- correct?

 5     A.    When I initially purchased it?

 6     Q.    Yes.

 7     A.    September 11th, 2001.

 8     Q.    And was that loan with CitiMortgage?

 9     A.    No.

10     Q.    Who was that with?

11     A.    I believe it was PHH or Cendant, and then one or

12  the other purchased.

13           And then Citi purchased.

14     Q.    Okay.  So Citi eventually purchased your loan?

15  You --

16     A.    Correct.

17     Q.    -- didn't take --

18     A.    Yes.

19     Q.    -- take out another loan --

20           (Remarks outside the record.)

21  BY MS. WHITWORTH:

22     Q.    So why did you take out the loan in 2001?

23     A.    To purchase a home.

24     Q.    And was this for your personal residence?

25     A.    Yes.
```

1      Q.    And what do you believe would happen to a car,

2    for example, that was used as collateral for a loan if

3    you did not pay off the loan?

4      A.    Then you refinance the car or you lose the car.

5      Q.    When you say "you lose the car," what do you

6    mean by that?

7      A.    If you don't pay for something, then it's --

8    then other things happen.

9      Q.    Could the lender repossess the car, for example?

10     A.    As one option, yes.

11     Q.    And so when you say that your home was used as

12   collateral, do you understand that if you did not pay for

13   your loan that the bank could repossess your home?

14     A.    As one option, yes.

15     Q.    And going back to the home equity line of

16   credit, what bank was that loan with?

17     A.    Citibank or CitiMortgage.

18     Q.    It was with CitiMortgage?

19     A.    The first one, yes.

20     Q.    And how many equity lines of credit did you

21   have?

22     A.    Two.

23     Q.    Okay.  And when did you take out the first home

24   equity line of credit?

25     A.    I don't have the dates handy.

1           It was for less than a year.  And I took it out

2     and then switched to NuVision, which had better rates.

3           Q.   So did you pay off --

4           A.   Yes.

5           Q.   Let me finish.

6                Did you pay off the Citi home equity line before

7     you paid the NuVision -- excuse me, before you took out

8     the NuVision home equity line?

9           A.   Yes.

10          Q.   So you only had one out at a time?

11          A.   Yes.

12          Q.   And did you pay the home equity lines, both of

13    them, every month?

14          A.   Yes -- well, Citibank or CitiMortgage, yes.

15               NuVision, yes, until the last few months.

16          Q.   Okay.  We'll get to that in a minute.

17               What name was the CitiMortgage home equity line

18    of credit in?

19               Was it in your name?

20          A.   My name.

21          Q.   And the NuVision line of credit was in your

22    name?

23          A.   Yes.

24          Q.   In your personal capacity?

25          A.   It could have been my trust.

```
 1        Q.   Okay.  You said you took out the proceeds to do

 2   home improvements.

 3             Was that the Citi loan or the NuVision loan?

 4        A.   I don't recall when I started the work, but the

 5   purpose of the HELOC was to do some improvements.

 6        Q.   Which HELOC?

 7        A.   Either one.

 8        Q.   Both of them?

 9        A.   Both.

10        Q.   And how much was the Citi HELOC for?

11        A.   I don't recall.

12        Q.   Do you remember how much the NuVision HELOC loan

13   was?

14        A.   I don't recall.

15        Q.   Do you remember what your monthly payments were?

16        A.   No.

17        Q.   Going back to the original loan you took out in

18   2001, did you ever fall behind on those loan payments?

19        A.   No.

20        Q.   You never --

21        A.   Never.

22        Q.   -- did not pay?

23        A.   Correct.

24        Q.   Okay.  So, Ms. Robbins, did you --

25        A.   Oh, never, up to the very end; sorry.
```

1        Q.    Okay.

2        A.    Up until that point, I always paid.

3        Q.    You paid every month?

4        A.    Yes.

5        Q.    On time?

6        A.    Yes.

7        Q.    Now, when did you stop paying?  You said up

8    until those last few months.

9              What do you mean by that?

10       A.    Yes.

11             I contacted -- I'm sorry.  Rephrase the

12   question.

13       Q.    Just answer the question:  When did you stop

14   paying on the loan?

15       A.    I believe January of 2012.

16       Q.    And do you know when you made your last payment

17   on the loan?

18       A.    I believe December of 2011.

19       Q.    And why did you stop making payments?

20       A.    I had been unemployed for two of the previous

21   three years.

22             I had exhausted most of my savings.

23             I was applying for a HAMP modification in order

24   to keep my home, as well as pursuing every available

25   means to refinance from both the HELOCs, as well as from

1       A.   It was sold in May of 2012.

2       Q.   Was the loan paid off?

3       A.   Yes.

4       Q.   Was it paid in full?

5       A.   Yes.

6       Q.   So in your complaint, Ms. Robbins, you state

7    that the loan was sold in a short sale?

8       A.   Yes.

9       Q.   Is it your understanding that the loan was sold

10   via a short sale?

11      A.   I am unable to answer that as I don't understand

12   who -- I don't understand the process.

13      Q.   Do you know what a short sale is?

14      A.   When a home is sold for less than the full

15   amount.

16      Q.   And so you understand that with a short sale,

17   the home is sold for less than the full amount and the

18   lender does not receive the full amount of the loan?

19      A.   Yes.

20      Q.   And in your complaint, you stated that the

21   property was sold and the account resulted in a short

22   sale.

23           Just now, you've said that the account was paid

24   in full.

25      A.   Yes.

1    Q.   Which one is correct?

2    A.   Both.

3    Q.   Can you please explain how that's possible?

4    A.   NuVision settled for less than the full amount;

5  Citi was paid in full.

6    Q.   So it was a short sale, but only as to NuVision?

7    A.   Yes, which is why I was confused.

8         I thought a short sale encompasses the whole

9  property.

10   Q.   So is it fair to say that at points when you

11 were communicating with CitiMortgage, you were confused

12 about whether the loan resulted in a short sale or not?

13   A.   I can't answer.

14        I knew there was a short sale.

15        I didn't understand the difference between Citi

16 being paid in full and NuVision accepting payment for a

17 charge-off.

18   Q.   Okay.  At some point, did you inform

19 CitiMortgage that there was a short sale on the property?

20   A.   Yes.

21   Q.   And did you want your credit reporting updated

22 to reflect that it had been a short sale?

23   A.   Yes.

24   Q.   And did you tell Citi representatives that they

25 could report it as a short sale?

```
1        A.    I believe I did.

2              MS. WHITWORTH:   I want to show you a document.

3              We'll mark this as Exhibit A (indicating).

4              (Deposition Exhibit A was marked.)

5    BY MS. WHITWORTH:

6        Q.    Do you recognize this document, Ms. Robbins

7    (indicating)?

8        A.    Yes.

9        Q.    And what is this?

10       A.    This was, I believe, my initial request to

11   CitiMortgage to correct the Credit Bureau reporting.

12       Q.    And do you see in the second paragraph, it's

13   underlined, where it says, "I sold my condo via a short

14   sale"?

15       A.    Yes.

16       Q.    And do you remember writing that?

17       A.    Yes.

18       Q.    And did you believe that your condo had been

19   sold via a short sale?

20       A.    Yes.

21       Q.    Did you understand at the time that the

22   CitiMortgage loan did not actually result in a short

23   sale?

24       A.    No.

25       Q.    And when did you first realize that the
```

1    Q.   And how did you finance buying that property?

2    A.   The same as the other home, a loan.

3    Q.   And were you current on that loan?

4    A.   Yes.

5    Q.   What were your monthly payments?

6    A.   I don't recall.

7    Q.   How were you able to make the monthly payments

8  every month?

9    A.   I have tenants.

10   Q.   And do you still own that property?

11   A.   Yes.

12   Q.   And whose name was on the title to that

13 property?

14   A.   My name or my trust.

15   Q.   And when you sold the 34 Rainwood home, whose

16 name was on the title to that property?

17   A.   My name or the trust.

18        MS. WHITWORTH:  We'll mark this as Exhibit B

19 (indicating).

20        (Deposition Exhibit B was marked.)

21 BY MS. WHITWORTH:

22   Q.   Ms. Robbins, do you recognize this document

23 (indicating)?

24   A.   Yes.

25   Q.   And what do you recognize this document to be?

```
 1        A.    A letter from Citi.

 2        Q.    Have you seen this letter before?

 3        A.    Yes.

 4        Q.    And what is the date on this letter?

 5        A.    April 20th, 2012.

 6        Q.    And where is this letter addressed?

 7        A.    Where?

 8        Q.    Yes.

 9        A.    To my address.

10        Q.    Were you living at your address, 34 Rainwood, on

11   April 20th, 2012?

12        A.    Yes.

13        Q.    Were you receiving mail there in April of 2012?

14        A.    Yes.

15        Q.    And did you receive this letter in April of

16   2012?

17        A.    Yes.

18        Q.    Do you see at the beginning of the letter where

19   it says, "Due to your lack of payment on your mortgage,

20   we have contacted our attorney to begin foreclosure

21   proceedings on your loan"?

22        A.    Yes.

23        Q.    And do you remember reading that in April of

24   2012?

25        A.    Yes.
```

```
 1      A.   No.

 2      Q.   What happened to those notes?

 3      A.   I lost my email.

 4      Q.   So were your notes taken on your email?

 5      A.   (Nodding head.)

 6      Q.   And how did you lose your email?

 7      A.   I moved, and Cox took away my account.  And I

 8  didn't save them -- I didn't think to save them.

 9      Q.   And when was that?

10      A.   May 2012.

11           MS. WHITWORTH:  I'm going to mark this as

12  Exhibit C (indicating).

13           (Deposition Exhibit C was marked.)

14  BY MS. WHITWORTH:

15      Q.   Do you recognize this document (indicating)?

16      A.   Yes.

17      Q.   And what is it?

18      A.   This is a letter from Cal-Western Reconveyance

19  Corporation.

20      Q.   And did you receive this document --

21      A.   Yes.

22      Q.   -- in the mail?

23           And what did you understand this document to

24  mean when you received it?

25      A.   That the mortgage loan has been referred to this
```

1          MR. LOKER:  Well, it does, though.

2          Can we go off the record for a second?

3          (Remarks outside the record.)

4          MR. LOKER:  Back on the record.

5    BY MS. WHITWORTH:

6      Q.   What have you seen on your credit report that

7    you think is inaccurate?

8      A.   Various mentions to "foreclosure."

9      Q.   And what exactly do those various mentions say?

10     A.   It varies by Credit Bureau.

11     Q.   And do those "foreclosure" mentions say that a

12   foreclosure sale occurred?

13     A.   I don't recall.

14     Q.   And do you remember seeing that the reports

15   showed that foreclosure proceedings started?

16     A.   Could you repeat that?

17     Q.   Do you remember seeing that your credit reports

18   showed that a foreclosure proceeding started?

19     A.   Yes.

20     Q.   But you do not recall seeing on your reports

21   that a foreclosure sale occurred?

22     A.   I do not recall one way or another.

23     Q.   And how did you first learn that the reports

24   were showing that there was foreclosure language on them?

25     A.   When I went to refinance my loan, my mortgage

1    broker immediately told me that we have to get the

2    foreclosure mention removed because I would not qualify

3    for a loan.

4         Q.   And when was that?

5         A.   August -- late August 2014.

6         Q.   And --

7         A.   The 28th, 29th, approximately.

8         Q.   And your broker told you that you needed to get

9    the foreclosure off your report.

10        Did the broker tell you that the "foreclosure"

11   mention was incorrect?

12        A.   He did not comment one way or the other.

13        Q.   And did you believe at the time that the

14   reporting was incorrect?

15        A.   Yes.

16        Q.   And why did you believe that?

17        A.   Because the house was not foreclosed; it was

18   sold in a short sale.

19        Q.   And what was your basis for believing that the

20   reporting was incorrect?

21        A.   Because CitiMortgage was paid in full and a

22   foreclosure did not occur.

23        Q.   And so you're claiming that a foreclosure sale

24   did not occur; correct?

25        A.   Yes.

1   reviewing; it takes 30 to 45 days."

2      Q.   And you never received a response saying whether

3   they were changing the score or not?

4      A.   I don't believe so.

5      Q.   Okay.  Did you ever reach out at any time to the

6   credit reporting agencies?

7      A.   Yes.

8      Q.   When was that?

9      A.   I don't recall the first time.

10          I have the notes.

11     Q.   "The first time."

12          So how many times did you reach out to --

13     A.   I called them all and -- it was a very manual

14   process.

15          So then I went ahead and put letters together

16   and sent letters.

17     Q.   And when was this?

18     A.   The letters were sent in April of 2015, yes.

19     Q.   Did you receive --

20     A.   Approximately.

21     Q.   Did you receive a response?

22     A.   Yes.

23     Q.   And what was that response?

24     A.   I sent letters to all three Credit Bureaus.

25          All three checked with Citi, verified the

1    information, and declined to make changes based on what

2    Citi had told them.

3         Q.   And was that the only time that you sent any

4    disputes directly to the credit reporting agencies?

5         A.   Yes.

6         Q.   And going back to your conversations with Citi,

7    after the September -- excuse me, I think you said August

8    2014, you spoke with Citi; is that correct?

9         A.   Yes.

10        Q.   And you did all of these conversations over the

11   phone?

12        A.   A majority were over the phone.

13        Q.   Did you send any letters to Citi?

14        A.   Yes.

15        Q.   And --

16        A.   Exhibit A (indicating).

17        Q.   Got it.

18             And do you recall receiving any responses from

19   Citi to these letters?

20        A.   Yes.

21        Q.   And what did the responses say?

22        A.   It was under investigation.

23             It would take 72 hours.

24             They would get back to me.

25        Q.   And over the phone, did anybody at Citi ever

1   tell you that the reporting was, in fact, incorrect?

2       A.   Could you rephrase it?

3       Q.   I think it's a pretty simple question.

4            Did anyone at Citi tell you that they were

5   reporting incorrectly?

6       A.   Yes.

7       Q.   And who was that?

8       A.   Zach Michael.

9       Q.   What did he tell you exactly?

10      A.   That he discovered that the loan was paid in

11  full, and that Citi had been reporting it for settled

12  than less than the full amount.

13      Q.   You allege in your complaint that Citi failed to

14  conduct a reasonable investigation with respect to the

15  disputed information?

16      A.   Yes.

17      Q.   What do you mean by that?

18           MR. LOKER:  Legal conclusion.

19           THE WITNESS:  It's been two-and-a-half years;

20  hundreds of hours.

21           That's a little unreasonable.

22  BY MS. WHITWORTH:

23      Q.   And what evidence do you have to support your

24  assertion that Citi did not conduct a reasonable

25  investigation?

1            MR. LOKER:  Same objections.  It's a legal

2    conclusion.

3            THE WITNESS:  I don't have evidence one way or

4    another as to what Citi did or did not do.

5    BY MS. WHITWORTH:

6        Q.   So is your basis for believing that Citi's

7    investigation was unreasonable based on the fact that

8    they have still not changed your credit reporting?

9            MR. LOKER:  Legal conclusion.

10           THE WITNESS:  I have no comment on whether it

11   was a reasonable or unreasonable investigation.

12   BY MS. WHITWORTH:

13       Q.   So you are not sure whether or not Citi

14   conducted a reasonable investigation?

15           MR. LOKER:  Same objection.

16           THE WITNESS:  Correct.  I'm unsure.

17   BY MS. WHITWORTH:

18       Q.   Again, did you take notes of your call with

19   CitiMortgage representatives?

20       A.   At what time?

21       Q.   At any point when you were disputing the

22   reporting of your credit, and you were discussing this

23   with Citi representatives, did you take notes

24   memorializing your phone calls?

25       A.   I took some notes, yes.

1    Q.   -- is that right?

2    A.   Yes.

3         MR. LOKER:   Remember to -- sorry.

4         Remember to allow Alex to ask the full question.

5         THE WITNESS:   Sorry.

6  BY MS. WHITWORTH:

7    Q.   Can you tell me all of the damages that you are

8  claiming in this case?

9    A.   Yes.

10        MR. LOKER:   That's a legal conclusion, as well.

11        THE WITNESS:   Yes.

12  BY MS. WHITWORTH:

13   Q.   And what are those damages based on?

14        MR. LOKER:   Vague and ambiguous.

15  BY MS. WHITWORTH:

16   Q.   Of your understanding of my question, what are

17  your damages based on?

18   A.   Being damaged.

19   Q.   How so?

20   A.   I was denied credit.

21        I was unable to qualify for a loan.

22   Q.   Anything else?

23   A.   I was unable to purchase a home.

24   Q.   Okay.  Anything else?

25   A.   At this time, no.

1      Q.   So what credit were you denied?

2      A.   When I went to purchase a car, I was denied the

3  ability to finance the car.

4           And when I requested backup documentation, I was

5  sent a letter that Chase denied the credit due to

6  foreclosure.

7      Q.   Were there any other loans that you were denied?

8      A.   I was trying to apply for a refinance, and I

9  couldn't apply because of the "foreclosure" mention.

10     Q.   And when was that?

11     A.   August through October, November of 2014.

12     Q.   Okay.  And is this the same refinance you

13 referred to earlier when you said this was the first time

14 you learned that the foreclosure was being reported on

15 your credit?

16     A.   Yes.

17     Q.   And were there any other loans or credit that

18 you have been denied that you know of?

19     A.   Been denied, no.

20     Q.   And you also mentioned that you lost the ability

21 to purchase a house; is that correct?

22     A.   Yes.

23     Q.   And can you tell me a little bit about that?

24     A.   I was living in Washington state and planned to

25 purchase a home as I'd been employed for two-and-a-half

1    years.

2         And I was unable to qualify for a loan for the

3    same reasons I was unable to refinance, because of the

4    "foreclosure" mention on my credit report.

5    Q.   And are there any other opportunities you

6    believe you have lost as a result of the "foreclosure"

7    mention on your credit report?

8    A.   Not at this time.

9    Q.   I will go in reverse order of what you said and

10   start with the condo in Seattle.

11        Did you say "Seattle" or "Washington"?

12   A.   Same.

13   Q.   Okay.

14   A.   Yes.

15   Q.   Was it in the city of Seattle, Washington, or a

16   different city?

17   A.   Bellevue.

18   Q.   Okay.  And what was the address of the condo you

19   wanted to purchase?

20   A.   I didn't have an address.

21   Q.   And when exactly was this?

22   A.   This was September through November of 2014.

23   Q.   You said there was no address.

24        So did you have a specific home or condo in mind

25   to buy?

1      A.    No.

2      Q.    Did you apply for a loan in order to buy a

3 house?

4      A.    No.

5      Q.    Why not?

6      A.    Because there was a "foreclosure" mention on my

7 credit report, which would have denied me the ability to

8 secure a loan.

9      Q.    And how do you know that that would have denied

10 you the ability to secure a --

11     A.    Because I -- sorry.

12           Because I could not refinance my loan.  That was

13 the first step, to get my debt on a fixed loan.  And then

14 I would have the ability to secure a home for myself.

15           Since I couldn't secure the rental property loan

16 that was adjustable, it was a high risk.

17           So I did not apply for a loan for the condo that

18 I was still identifying.

19     Q.    So is it your claim that you were unable to buy

20 the condo because you could not refinance your rental

21 property?

22     A.    A portion.

23     Q.    And so you never applied for a loan for a

24 property in Bellevue?

25     A.    Correct, yes.

1        Q.    And approximately at this time -- I think you

2    said September to November of 2014; is that correct?

3        A.    Yes.

4        Q.    At that time, how much cash did you have on

5    hand?

6        A.    I don't recall.

7        Q.    Would you say it was more than $50,000?

8        A.    No.

9        Q.    More than $10,000?

10       A.    Cash on hand?

11       Q.    Correct.

12       A.    I don't know what was in my bank account at the

13   time.

14       Q.    And would you have made a down payment on any

15   property that you purchased in Bellevue?

16       A.    Yes.

17       Q.    And how much would you have put down?

18       A.    The minimum.

19       Q.    Do you know what the minimum was?

20       A.    3 to 5 to 10 percent, depending on the loan.

21       Q.    And how do you know that?

22       A.    That's what you put down.  Those are options

23   that were affordable for me.

24       Q.    And at the time, did you speak with a mortgage

25   broker who told you that those were the options available

1    to you?

2         A.   Not to get the specifics, no.

3         Q.   So where do you get the idea that you could put

4    down 3 to 5 to 10 percent?

5         A.   When I spoke with a mortgage broker about buying

6    a property in theory, at the beginning of this process,

7    we discussed what the rates were so I knew what he could

8    afford.

9         Q.   And what could you have afforded?

10        A.   About $300,000.

11        Q.   And do you know -- well, let's ask this.

12             What do you know about the housing market in

13   Seattle/Bellevue, Washington, that area at the time?

14        A.   It was excellent.

15        Q.   What do you mean by "excellent"?

16        A.   There was very low vacancy for rentals, and

17   there was high demand for property.

18             There was multiple buildings being built.

19        Q.   So was there usually, if there was high demand

20   for property, multiple offers being put on homes?

21        A.   I don't know, since I did not put an offer on a

22   home.

23        Q.   And why do you think you've been damaged as a

24   result of not being able to purchase a home in

25   Washington?

1          MR. LOKER:  Legal conclusion.

2          THE WITNESS:  The prices in Seattle have

3    outpaced the nation for home prices.

4          There are multiple buyers; it's a sellers'

5    market.

6          Prices go for well over asking price.

7          They have outpaced in terms of value and sale

8    price as of today.

9    BY MS. WHITWORTH:

10   Q.   And so how do you quantify that damage?

11         MR. LOKER:  Expert testimony and legal

12   conclusion, as well.

13         THE WITNESS:  Yes.

14         What my -- what a $300,000 home would be worth

15   today.

16   BY MS. WHITWORTH:

17   Q.   And what do you believe a $300,000 home would be

18   worth today?

19   A.   More than $300,000.

20   Q.   How much more than $300,000?

21         MR. LOKER:  Same objections.

22         THE WITNESS:  I have not run the numbers.

23   BY MS. WHITWORTH:

24   Q.   And you were working at Microsoft at the time;

25   is that correct?

1      A.    Yes.

2      Q.    And why did you stop working at Microsoft again?

3      A.    My position was eliminated.

4      Q.    And how do you believe you would have

5  continued -- well, do you believe you could have

6  continued making housing payments on a home in Bellevue,

7  Washington, while unemployed?

8      A.    Yes.

9            MR. LOKER:   Speculation.   Harassing.

10  BY MS. WHITWORTH:

11     Q.    Why do you believe you would have been able to

12  continue making payments even if you were unemployed?

13     A.    I have faith in myself.

14     Q.    And do you know when you would have sold that

15  property?

16           MR. LOKER:   Speculation.

17           THE WITNESS:   I wasn't planning to sell it,

18  because of the -- what I had observed over two-and-a-half

19  years of living there, how hot the market was, how many

20  people were moving to Bellevue and the Seattle area, and

21  the economy, which continues to this day.

22           My intention had always been to buy a home and

23  keep it.

24  BY MS. WHITWORTH:

25     Q.    But then you moved to San Jose; correct?

1        A.    Yes.

2        Q.    And do you know whether you would have kept a

3   home in Bellevue, Washington, after you moved to

4   San Jose?

5        A.    I don't know.

6        Q.    And do you know whether you -- I'll stop with

7   that.

8              What was your approximate income at the time you

9   were living in Bellevue?

10       A.    $140,000 annual salary.

11       Q.    And do you know what the monthly payments would

12  have been on a loan for approximately $300,000?

13       A.    $2,000 a month.

14       Q.    And do you have any documents to support your

15  claim based on your lost ability to purchase a home in

16  Washington?

17       A.    Do I have any documents?

18       Q.    Yes.

19       A.    Could you explain?

20       Q.    Do you have any documents that support the

21  claims that you're making over the past 10 minutes, let's

22  say?

23       A.    Could you define a document that would be

24  acceptable?

25       Q.    In your view, do you believe you have any

1   documents that would assist you in asserting these

2   claims?

3        A.   I'm uncertain.

4        Q.   Okay.  Do you know what interest rate a loan

5   would have been at the time when you wanted to purchase a

6   property in Washington?

7             MR. LOKER:  Speculation.

8             THE WITNESS:  They were in the range of 3.5 to

9   3.75 for homeowner-occupied loans.

10  BY MS. WHITWORTH:

11       Q.   And would you have obtained a fixed-rate loan or

12  an ARM?

13       A.   It would have depended, at the time, which made

14  the most sense.

15       Q.   So you don't know which type of loan you would

16  have acquired?

17       A.   No.

18       Q.   And you also were discussing a refinance in

19  September of 2014; is that correct?

20       A.   Yes.

21       Q.   And when did you first apply for this refinance?

22       A.   I began the process August 28th or 29th of 2014,

23  approximately.

24       Q.   And when you say you "began the process," what

25  do you mean?

```
 1   obtain a loan for a car?
 2       A.   I was denied credit solely due to a foreclosure
 3   being reported.
 4       Q.   But again, other than the fact that you were
 5   denied credit based on the foreclosure, why do you
 6   believe you were harmed by not being able to obtain the
 7   loan?
 8            MR. LOKER:  Legal conclusion.
 9            THE WITNESS:  I lost interest for money that
10   would have accrued interest had I not had to pay for the
11   car out of my own pocket instead of financing it.
12   BY MS. WHITWORTH:
13       Q.   And do you know if you would have had to pay
14   interest on the car loan?
15       A.   Yes.
16       Q.   And what would that interest have been?
17       A.   I don't recall the rate.
18       Q.   You don't know what the rate was --
19       A.   No.
20       Q.   -- for the interest?
21            And so how much are you claiming in damages
22   based on your inability to invest this money elsewhere?
23            MR. LOKER:  Legal conclusion.  Expert testimony.
24            THE WITNESS:  Are you making me an offer?
25            MR. LOKER:  No.
```

1      A.   $19,500.

2      Q.   And if you had instead taken out a loan for the

3 car, do you know what your car payments would have been?

4      A.   I don't recall offhand.  It's on the paperwork.

5      Q.   Okay.

6      A.   I don't know.

7      Q.   Do you have that paperwork still?

8      A.   Yes.

9      Q.   And how long would the car loan have lasted?

10     A.   Four or five years.

11     Q.   And what kind of car did you ultimately

12 purchase?

13     A.   A Jeep.

14     Q.   Is that the same car that you would have

15 purchased had you obtained a loan?

16     A.   Yes.

17          MS. WHITWORTH:  We'll mark this Exhibit G

18 (indicating).

19          (Deposition Exhibit G was marked.)

20 BY MS. WHITWORTH:

21     Q.   How many banks did you apply for loans with for

22 the car?

23     A.   Banks?

24     Q.   Yes.

25     A.   I don't remember.

1          MR. LOKER:   Remember to let Alex ask the full

2     question.

3          THE WITNESS:   Sorry.

4     BY MS. WHITWORTH:

5     Q.   Is it your testimony that you have not seen a

6     doctor as a result of anything that Citi has done?

7     A.   No, that is not my testimony.

8     Q.   Have you seen a doctor related to your emotional

9     distress?

10    A.   Yes.

11    Q.   How many times did you go to the doctor?

12    A.   Several.

13    Q.   Who did you see?

14    A.   Dr. Stephanie Tyson.

15    Q.   And why did you go to Dr. Tyson?

16    A.   Being stressed.

17    Q.   And can you elaborate what you mean when you say

18    "stressed"?

19    A.   Well, I cannot indicate what caused the stress,

20    whether the excessive hours of having to deal with this;

21    the refusal of your client to correct their mistake;

22    whether it was from being between jobs; being unemployed

23    for two of the previous three years; when I lost my home.

24          There's multiple causes as to what causes

25    stress.

```
1                    REPORTER'S CERTIFICATE

2           I, Dawn A. Stark, a Certified Shorthand

3    Reporter, do hereby certify:

4           That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me;

7           That the testimony of the witness, the

8    questions propounded, and all objections and statements

9    made at the time of the examination were recorded

10   stenographically by me and were thereafter transcribed;

11          That a review of the transcript by the deponent

12   was requested;

13          That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18          I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21

22   Dated:  July 11, 2017

23

24   _____

25   Dawn A. Stark, CSR No. 7847
```

# EXHIBIT B

NATASHA STRINGER

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4    JACALYN ROBBINS,

5         Plaintiff,

6         vs.                    Case No.

7    CITIMORTGAGE INC.,          CV16-06844 PA (ASx)

8    EXPERIAN INFORMATION

9    SOLUTIONS, INC.; EQUIFAX

10   INFORMATION SERVICES, LLC;

11   AND TRANS UNION, LLC,

12        Defendants.

13   _____

14

15

16

17        DEPOSITION OF NATASHA STRINGER

18      Taken on behalf of the Plaintiff

19             July 18, 2017

20

21

22

23

24   JOB No. 2651761

25   PAGES 1 - 41

                                      Page 1

NATASHA STRINGER

1 so we're looking at Page 4, Line 12, and it refers
2 to Paragraph 28.
3      A.    Yes.
4      Q.    Okay.  And do you know what a Notice
5 of Default is?
6      A.    Yes.
7      Q.    What's your understanding of that?
8      A.    For the state of California it's the
9 notice of the foreclosure proceedings that's filed
10 with the state.
11     Q.    And how did you obtain that
12 familiarity with the Notice of Default?
13     A.    It's within my normal course of
14 business training.  A Notice of Default is
15 different for various states.
16     Q.    I see.  So it's your on-the-job
17 exposure, your familiarity with the document
18 itself?
19     A.    Correct.
20     Q.    Do you know if a Notice of Default
21 was filed with regard to Ms. Robbins' property?
22     A.    It was not.
23     Q.    Do you, does CitiMortgage normally
24 file a Notice of Default in the state of
25 California?

Page 18

1      A.    Yes.
2      Q.    Who is that?
3      A.    I don't have the specific person.
4      Q.    Okay.  Do you know which department
5 they would work at?
6      A.    In foreclosure.
7      Q.    I see.  Is there a head of the
8 foreclosure department?
9      A.    There is, I do not know who that is
10 though.
11     Q.    That's okay.  That's normal, not
12 remembering certain things especially in this type
13 of situation.
14           Let's see.  Paragraph 31 of the
15 complaint is on Page 6 and the corresponding answer
16 is still on Page 4.  Again I'll read it.
17           In addition, Citi also reported a
18 foreclosure started status in regards to
19 plaintiff's alleged loan, despite the fact that
20 defendant never officially started a foreclosure
21 proceeding against plaintiff, including never
22 filing a Notice of Default as required by
23 California civil code, section 2924, in order to
24 initiate a foreclosure.
25           From, what's your understanding of

Page 20

1      A.    Yes.
2      Q.    Do you know why one was not filed for
3 Ms. Robbins?
4      A.    Because payoff funds were received.
5      Q.    So when would the Notice of Default
6 typically be filed for a property?
7      A.    It is prepped by our attorney and
8 filed after a referral is done to them from the
9 business.
10     Q.    Does the attorney have a specific
11 time line in which CitiMortgage wants the Notice of
12 Default filed?
13     A.    No.
14     Q.    Okay.  Do you know when the attorney
15 would normally file the Notice of Default?
16           MS. WHITWORTH:  Objection, calls for
17 speculation.
18     A.    After the business approves the draft
19 to be filed.
20     Q.    (BY MR. LOKER)  Have you personally
21 approved a draft to be filed of a Notice of
22 Default?
23     A.    No.
24     Q.    Is there someone within CitiMortgage
25 that would be familiar with that approval process?

Page 19

1 when the, or sorry, the corresponding answer was a
2 denial in the answer and my question is what's your
3 understanding of when the foreclosure starts?
4      A.    Citi takes foreclosure being started
5 upon the referral to our foreclosure counsel.
6      Q.    Okay.  Is there a particular reason
7 that, I mean that's when Citi believes the
8 foreclosure starts?
9      A.    Can you rephrase that for me?
10     Q.    Sure.  You know what I'm getting at,
11 is there like a manual or a document that you refer
12 to or reviewed to answer when a foreclosure starts
13 on behalf of Citi?
14     A.    No, there's not a specific manual
15 regarding it.
16     Q.    How do you know when a foreclosure
17 begins as a business practice then?
18     A.    I once handled foreclosure referrals
19 to our attorney as part of my prior employment with
20 the business.
21     Q.    Okay.  So step one for Citi for the
22 foreclosure process is sending it to your
23 foreclosure attorney?
24     A.    Correct.
25     Q.    Are there, is it the same law firm

Page 21

6 (Pages 18 - 21)

1    A.    No.
2    Q.    Okay.  Did you assist with the
3  document production at all for this case?
4    A.    I did not.
5    Q.    There are certain e-mails produced,
6  looks like internal e-mails from Citi.  Do you know
7  anything about those?
8    A.    Not without seeing them, no.
9    Q.    Okay.  Are you familiar with the
10  processes where CitiMortgage was looking into
11  whether a foreclosure had occurred on this
12  particular file?
13    MS. WHITWORTH:  Objection, vague.
14    A.    Can you specify on that?
15    Q.    (BY MR. LOKER)  Did you review, you
16  know, Ms. Robbins' file at all with regard to the
17  foreclosure or short sale process?
18    A.    I did.
19    Q.    What did you review?
20    A.    I reviewed the payments that had
21  posted to the system as well as the chronology of
22  the payments posted and the default leading up to
23  the referral to our foreclosure attorney.
24    Q.    Okay.  And do you recall what
25  information you saw during that review process?

Page 34

1  anything, I just want to know are you personally
2  aware that the, Ms. Robbins' credit report says
3  that CitiMortgage began the foreclosure process?
4    A.    Yes.
5    Q.    And how are you aware of that?
6    A.    That was part of the information that
7  I received in preparing for this.
8    Q.    Okay.  Aside from receiving that
9  information in order to prepare for this deposition
10  were you aware of the credit reporting for any
11  other reason?
12    A.    No.
13    Q.    And do you agree with the credit
14  reporting, that the foreclosure process had
15  started?
16    MS. WHITWORTH:  Objection, vague.
17    Q.    (BY MR. LOKER)  And your answer
18  please?
19    A.    Can you repeat the question?
20    Q.    Right.  So specifically, I know you
21  don't have it in front of you but a special
22  interrogatory asks for the factual basis for
23  various requests for admissions and one of the
24  responses that CMI, which is Citi, admits that it
25  never filed a Notice of Default which I think you

Page 36

1    A.    Can you repeat that?
2    Q.    Yeah.  Do you recall what information
3  you saw during that review process?
4    A.    That the borrower's regular payment
5  was made for December of 2011 and there was no
6  payments received in January, February, March,
7  April and May until a payoff of the loan was
8  received in mid May.
9    Q.    Sorry, what year?
10    A.    2012.
11    Q.    Do you know at what point Citi sent
12  the account to Pite Duncan?
13    A.    In April of 2012.
14    Q.    And upon sending the account to Pite
15  Duncan that's when Citi initiates the foreclosure
16  process?
17    A.    Upon the referral, yes.
18    Q.    Are you familiar with how
19  CitiMortgage is reporting their accounts to Ms.
20  Robbins' credit report?
21    A.    No.
22    Q.    You don't know that the credit report
23  said that the foreclosure process had started?
24    A.    Can you rephrase that?
25    Q.    Yeah.  I'm not trying to trick you or

Page 35

1  agree with, there's no Notice of Default filed for
2  this particular account.
3    A.    Correct.
4    Q.    The followup would be, however, CMI
5  did initiate foreclosure proceedings by referring
6  the loan to its foreclosure department.  You would
7  agree with that?
8    A.    Yes.
9    Q.    So on that last sentence, would that
10  be factually why you agree the reporting is
11  correct, that a foreclosure had started?
12    MS. WHITWORTH:  Objection, calls for
13  a legal conclusion.
14    Q.    (BY MR. LOKER)  Your answer?
15    A.    Not specifically referred to our
16  foreclosure department.  Foreclosure started on
17  behalf of the business would be the referral to our
18  attorney.
19    Q.    Okay.  Any other facts?  Obviously
20  not the law, the legal conclusion, but any other
21  facts about when the foreclosure started from
22  Citi's perspective with regard to Ms. Robbins
23  account?
24    A.    We consider foreclosure being started
25  upon the referral to Pite Duncan which was done in

Page 37

NATASHA STRINGER

1  mid April of 2012.
2      Q.   Okay.
3          MR. LOKER: We'll go off the record.
4  (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD)
5      Q.   (BY MR. LOKER) Do you know which
6  attorney with Pite Duncan handled this account?
7      A.   I do not.
8      Q.   If I asked you to find that
9  information later would you be able to go back to
10  your office and figure out which attorney handled
11  it?
12      A.   Yes.
13      Q.   Okay.
14          I don't have any questions, or any
15  more questions.
16          MR. LOKER: Alex, did we do a stip on
17  the last one or we just ended it?
18          MS. WHITWORTH: We just ended, I
19  believe.
20          MR. LOKER: Okay. Just with regard
21  to, and we'll put this on the record, with regard
22  to handling the transcript Alex do you want it sent
23  to your office?
24          MS. WHITWORTH: We would. And Ms.
25  Stringer will sign.

Page 38

1      I declare under penalty of perjury
2  under the laws that the foregoing is
3  true and correct.
4
5      Executed on _____, 20___,
6  at _____, _____.
7
8
9
10
11      _____
12          NATASHA STRINGER
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 40

1          MR. LOKER: Okay. It's probably only
2  going to be 40 to 60 pages, is two weeks long
3  enough to review and sign?
4          MS. WHITWORTH: Is that okay with
5  you?
6          THE WITNESS: More than enough.
7          MS. WHITWORTH: Yes.
8          MR. LOKER: Thank you. And the final
9  stipulation would be if the original's lost you'll
10  stipulate that we can use a certified copy for
11  purposes of trial and motions, is that agreeable
12  also?
13          MS. WHITWORTH: Sure.
14          MR. LOKER: Okay. We'll go off the
15  record then.
16
17  (Whereupon, the deposition concluded at 10:56 a.m.)
18
19
20
21
22
23
24
25

Page 39

1          REPORTER CERTIFICATE
2
3      I, SUZANNE BENOIST, Certified Shorthand
4  Reporter, do hereby certify that there came before
5  me at the law firm of Veritext Legal Solutions, 515
6  Olive Street, St. Louis, MO  63101, the
7  above-referenced parties, that the proceeding was
8  translated and proofread using computer-aided
9  transcription, and the above transcript of
10  proceedings is a true and accurate transcript of my
11  notes as taken at the time of said event.
12      I further certify that I am neither
13  attorney nor counsel for nor related nor employed
14  by any of the parties to the action in which this
15  examination is taken; further, that I am not a
16  relative or employee of any attorney or counsel
17  employed by the parties hereto or financially
18  interested in this action.
19      Dated this 2nd day of August, 2017.
20
21
22  _____
23      SUZANNE BENOIST, RPR, CCR, CSR-IL
24
25

Page 41

11 (Pages 38 - 41)

# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4   JACALYN ROBBINS,               )
                                    )
 5             Plaintiff,           )
                                    )
 6        vs.                       )  No. 16-cv-4732-LHK
                                    )
 7   CITIMORTGAGE, INC.; EXPERIAN   )
     INFORMATION SOLUTIONS, INC.;   )
 8   EQUIFAX INFORMATION SERVICES,  )
     LLC; and TRANS UNION, LLC,     )
 9                                  )
               Defendants.          )
10   _____)

11

12

13

14

15                    DEPOSITION OF

16                     BRAD LUDES

17                  IRVINE, CALIFORNIA

18             FRIDAY, AUGUST 04, 2017

19

20

21

22   REPORTED BY:

23   AMBER DAWN CASTANEDA,

24   RPR, CRR

25   CSR NO. 7640
```

 1   will purchase it, in a nutshell.

 2       Q.  That's not exactly true though, right?

 3   Aren't there loans -- aren't there banks who keep

 4   loans on their own books, for example?

 5       A.  There are.

 6       Q.  And there are banks who sell loans to other

 7   private financial institutions who are not Fannie or

 8   Freddie.

 9           Correct?

10       A.  There are.

11       Q.  And do you work with any of those types of

12   banks?

13       A.  I do.

14       Q.  Does Arcstone ever keep any loans on its

15   own books?

16       A.  We do not.

17       Q.  And you went into this a little bit, but

18   can you just tell me more about the process by which

19   your company assists potential borrowers when they

20   come in and what the steps would be in order to

21   qualify them for a loan or refinance?

22       A.  Take the application, submit it through the

23   engine, which is DU or LP, Fannie Mae or Freddie

24   Mac, generally.  Now that's a loan within those loan

25   parameters.  There are jumbo loans.  There are

1  stated income loans.  But I'm referring to

2  Ms. Robbins' loan when I answer your question.

3          So we'll put it through DU and LP, and

4  assuming we get an approval from them, then it goes

5  to the underwriter who will match the conditions

6  provided by the client with what Fannie and Freddie

7  are asking for.

8      Q.  What is DU and LP?

9      A.  DU is Fannie Mae's underwriting engine.  LP

10 is Freddie Mac's underwriting engine.

11     Q.  And this is the process you followed when

12 Ms. Robbins contacted you?

13     A.  Yes.

14     Q.  Is that correct?

15         And why didn't you --

16         You said that sometimes you don't

17 necessarily submit it to Freddie and Fannie.

18         Why did you in this case?

19     A.  Because she -- her type of loan application

20 wouldn't be relevant to those programs.  You could

21 take her to a sub prime program and charge her a

22 high rate that would put her in a worse position

23 than where she was originally.

24     Q.  And you said that you take applications

25 from potential borrowers.

1    question.

2        Q.  And is it difficult to refinance or get a

3    loan from a Fannie or Freddie lender if you have a

4    short sale on your account?

5        A.  More difficult.

6        Q.  And so it is possible that if you had a

7    short sale let's say within a year of your

8    application, it's possible that that might be the

9    reason for a denial?

10       A.  No.  There's a look-back period on short

11   sales as well, and those are generally four years.

12   They'll go two years with extenuating circumstances.

13       Q.  So again, if within four years of your

14   seeking a credit and you -- if you have a short sale

15   within those four years, it is possible that the

16   potential creditor will deny the credit?

17       A.  Possible, sure.

18       Q.  And you also state in this letter that

19   Ms. Robbins paid for an expedited rescoring.

20           Is your statement, is that statement also

21   based on what Ms. Robbins told you?

22       A.  Correct.

23       Q.  And do you know whether her credit score

24   would have been different if the foreclosure were

25   removed from the trade line?

1          Is it your belief that the credit bureaus

2     indicate any loan reported as 90-plus days late as

3     being in foreclosure?

4          A.   Yes.   But that's more of an underwriting

5     question, but I believe that's correct.

6          Q.   And what's your basis for that belief?

7          A.   Doing loans for 20-plus years.

8          Q.   So your understanding is that if a borrower

9     is 90-plus days late on their loan that the bureaus

10    report that as in foreclosure?

11         A.   That's my understanding.   But I would have

12    that confirmed with my underwriter before I made

13    that statement.

14         Q.   And do you have an opinion on whether it's

15    correct or not --

16         A.   I think it's correct.

17         Q.   -- to do that?

18         A.   Oh, I'm sorry.

19              To do what?

20         Q.   Correct or not to report a loan that's

21    90-plus days late as in foreclosure.

22         A.   Ask me again.

23         Q.   Do you have an opinion about whether it is

24    correct or not to report a loan that is 90-plus days

25    late as in foreclosure?

1          A.   I think that's correct, yes.

2          Q.   So if a loan is 90-plus days late, it is

3     accurate to say that it's in foreclosure?

4          A.   Yes.

5          Q.   Do you know whether Ms. Robbins was over 90

6     days late on her loan?

7          A.   I don't.

8          Q.   Have you communicated with Ms. Robbins

9     since she went through this process with Arcstone

10    Financial in what you believe was 2004?  I'm sorry,

11    2014?

12         A.   Yes, a few times.

13         Q.   And what have those communications been

14    about?

15         A.   Her loan.

16         Q.   Which loan?

17         A.   You've asked me if I've talked to her over

18    the last few years.  So I've talked to her.  I don't

19    know how many times.  A few times would have been

20    either this loan, that while we were going through

21    the process and it got turned down.  And then the

22    last I spoke with her briefly yesterday telling her

23    I got a subpoena and I'm coming to talk to you nice

24    people.

25         Q.   So you've talked about the case or about

1                        REPORTER'S CERTIFICATE

2

STATE OF CALIFORNIA        )
3                          )  ss.
COUNTY OF SAN BERNARDINO   )

4

5          I, AMBER DAWN CASTANEDA, RPR, CRR, a Certified

6   Shorthand Reporter duly licensed and qualified in and

7   for the State of California, do hereby certify:

8          That there came before me on the 4th day of

9   August, 2017, at Irvine, California, the following named

10  person, to-wit:  BRAD LUDES, who was duly sworn to

11  testify the truth, the whole truth, and nothing but the

12  truth of knowledge touching and concerning the matters

13  in controversy in this cause; and that he was thereupon

14  examined under oath and his examination reduced to

15  typewriting under my supervision; that the deposition is

16  a true record of the testimony given by the witness.

17         I further certify that pursuant to FRCP Rule

18  30(e)(1) that the signature of the deponent:

19         _X_ was requested by the deponent or a party

20  before the completion of the deposition;

21         _ _ was not requested by the deponent or a

22  party before the completion of the deposition.

23

24

25

```
 1            I further certify that I am neither attorney or

 2   counsel for, nor related to or employed by any of the

 3   parties to the action in which this deposition is taken,

 4   and further that I am not a relative or employee of any

 5   attorney or counsel employed by the parties hereto, or

 6   financially interested in the action.

 7

 8            CERTIFIED TO BY ME on this 8th day of August,

 9   2017.

10

11            _____

12                 AMBER DAWN CASTANEDA, RPR, CRR,
                        CSR No. 7640
13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
 2

 3      _____

        JACALYN ROBBINS,              :
 4                                    :
 5              Plaintiff,            :
 6                                    :
 7          v.                        :  Case No.
                                      :  16-cv-4732 LHK (NC)
 8      CITIMORTGAGE, INC.;           :
        EXPERIAN INFORMATION          :
 9      SOLUTIONS, INC.; EQUIFAX      :
        INFORMATION SERVICES          :
10      LLC; AND TRANS UNION          :
11      LLC                           :
12      _____:
13
14              Oral Deposition of KELLIE HARDING,
15      taken at the Offices of Veritext Legal
16      Solutions, 1250 I Street NW, Washington, DC,
17      beginning at 10:00 a.m.,  on Tuesday, August
18      8, 2017 before Ryan K. Black, a Registered
19      Professional Reporter, Certified Livenote
20      Reporter and Notary Public in and for the
21      District of Columbia.
22
23
24      Job No. 2674240
25      Pages 1 - 47

                                         Page 1
```

Kellie Harding

1              Q.   Okay.  So I believe what we
2       discussed is that the AUD, when you completed
3       it, that changed the reporting to reflect the
4       foreclosure.  Let me double-check exactly.  The
5       foreclosure was started; is that right?
6              A.   Yes.
7              Q.   Do you know what you reviewed in order
8       to determine that the foreclosure started?
9              A.   I had a -- I went -- I researched and
10      I had the default area completely research the
11      file for me.
12             Q.   What's the default area?
13             A.   A division, department.
14             Q.   Is it a division within Citi?
15             A.   Yes.
16             Q.   How many -- do you know how many
17      people are in that division?
18             A.   I do not.
19             Q.   Do you know who within that particular
20      division completed the research for you, in this
21      case that is?
22             A.   Not without going back that far, no.
23             Q.   Where would you go to find out that
24      information?
25             A.   I don't know.  Maybe an e-mail or

                                        Page 31

Kellie Harding

1          Q.   Do you know if the default division

2     has access to information outside of Citilink?

3          A.   I don't know.

4          Q.   In completing the AUD, did you do any

5     of your own investigation?

6          A.   Yes.

7          Q.   What did you do?

8          A.   Reviewed the account, prior history,

9     prior CBR information that was available to me

10    on Citilink.

11         Q.   When you're conducting an

12    investigation, do you normally reach out to a

13    default division?

14              MS. WHITWORTH:  Objection; vague.

15              THE WITNESS:  On occasion.

16    BY MR. LOKER:

17         Q.   Do you know why you reached out to the

18    default division in this particular matter?

19         A.   To validate.

20         Q.   Validate that a foreclosure was

21    started?

22         A.   Yes.

23         Q.   Was there something within the account

24    notes in Citilink that you reviewed that told

25    you a foreclosure started?

Page 33

Kellie Harding

1               C E R T I F I C A T E

2

3          I do hereby certify that the aforesaid

4     testimony was taken before me, pursuant to

5     notice, at the time and place indicated; that

6     said deponent was by me duly sworn to tell the

7     truth, the whole truth, and nothing but the

8     truth; that the testimony of said deponent was

9     correctly recorded in machine shorthand by me

10    and thereafter transcribed under my supervision

11    with computer-aided transcription; that the

12    deposition is a true and correct record of the

13    testimony given by the witness; and that I am

14    neither of counsel nor kin to any party in said

15    action, nor interested in the outcome thereof.

16          WITNESS my hand and official seal this

17    22nd day of August 2017.

18

19

20

21

22

23

24

25          Ryan K. Black

                                          Page 47

# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2

 3

 4

        JACALYN ROBBINS,
 5

                     Plaintiff,
 6                                      CIVIL ACTION FILE
             vs.
 7                                      NO. 16-cv-4732 LHK
        CITIMORTGAGE, INC.;
 8      EXPERIAN INFORMATION
        SOLUTIONS, INC.; EQUIFAX
 9      INFORMATION SERVICES LLC;
        AND TRANS UNION LLC,
10
                     Defendants.
11      ~~~~~~~~~~~~~~~~~~~~~~~~~~
12

13

14          VIDEO TELECONFERENCE DEPOSITION OF
15                    JOHN ULZHEIMER
16

17                 September 18, 2017
18                    10:15 a.m.
19                   Atlanta, Georgia
20

21

22

23

24      S. Julie Friedman, CCR-B-1476
25      Pages 1 - 85
```

Page 1

John Ulzheimer

```
 1           Q.     Okay.  But excluding the glossary, then
 2     it's up to the furnisher to determine whether
 3     foreclosure occurred, began, all those sorts of
 4     things?
 5           A.     Yeah.  I --
 6                  MS. WHITWORTH:  Objection.  Go ahead.
 7                  THE WITNESS:  I mean, I think it's
 8           always --
 9                  THE COURT REPORTER:  I'm sorry.  I didn't
10           get the full objection.
11                  MS. WHITWORTH:  Vague and ambiguous.
12                  THE COURT REPORTER:  Thank you.
13                  THE WITNESS:  Yeah.  I think it's always
14           up to the furnisher to decide internally when
15           they believe the foreclosure proceedings have
16           begun.
17           Q.     (By Mr. Loker)  Okay.  So we're done with
18     Metro 2.  You can put that big stack aside.
19                  The next exhibit is AAA, triple A; and
20     it's actually a printout of California Civil Code
21     Section 2924.  I'm aware you're not a lawyer.
22                  But have you ever seen the statute before,
23     John?
24           A.     Have I ever seen this statute or just this
25     statute in general?
```

Page 63

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF GEORGIA:

 4     COUNTY OF FULTON:

 5

 6              I hereby certify that the foregoing

 7          transcript was taken down, as stated in the

 8          caption, and the questions and answers thereto

 9          were reduced to typewriting under my direction;

10          that the foregoing pages 1 through 83 represent

11          a true, complete, and correct transcript of the

12          evidence given upon said hearing, and I further

13          certify that I am not of kin or counsel to the

14          parties in the case; am not in the regular

15          employ of counsel for any of said parties; nor

16          am I in anywise interested in the result of said

17          case.

18              This, the 28th day of September, 2017.

19

20

21

22

23          S. Julie Friedman

24          S. JULIE FRIEDMAN, CCR-B-1476

25
```

Page 85

# EXHIBIT F

# Expert Report of John Ulzheimer
# On Behalf of CitiMortgage, Inc.

## In the Matter of Robbins v. CitiMortgage, Inc.

**August 10, 2017**

## I.  QUALIFICATIONS

### A.  Employment History

I have worked in the consumer credit industry since November of 1991. I spent six years with Equifax Credit Information Services and spent several of those years both performing the consumer dispute process and managing a team of consumer service agents that also performed the consumer dispute process, including disputes related to identity theft and fraud. My team and I also handled the process of generating the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers. While at Equifax, I gained an intimate understanding of how credit files are compiled, stored, retrieved, and delivered. I also sold various Equifax Credit Marketing Services (CMS) products, which included lists for preapproved credit card offers.

At FICO (formerly known as Fair Isaac Corporation and best known for its FICO credit scores), I spent an additional seven years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders, and impacted by the information in consumer credit files. From time to time, I was involved with the development of FICO credit bureau scorecards, which are the heart of credit scores.

At Credit.com, I spent six years teaching consumers and the media how the consumer credit system works, including topics such as credit reporting, credit scoring, credit cards, and debt settlement, to name but a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union credit data like how a credit-scoring model would, and then gives the consumer an easy to understand summary of their credit risk. The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac, and Credit.com, I have worked with, helped train, and supervised employees on processes and procedures involved in credit reporting, credit report dispute resolution, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management.

I am also familiar with general underwriting practices, including what prospective lenders consider when determining credit risk. This includes a general understanding of what lenders consider important and not so important when considering a consumer's credit report. I gained this knowledge from many years of working with various lenders during my employment with Equifax, Fair Isaac, and Credit.com. In fact, during the first four years of my time at Fair Isaac, I taught members of the mortgage industry how to properly implement credit scoring into their processes. At the time, Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their two desktop underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their home-buying customers on the importance of solid credit management.

### B.    Presentations and Academia

I have made hundreds of credit reporting and credit scoring presentations during my time working in the credit industry. These presentations were delivered to consumers, consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities, and were of varying levels of complexity depending on the audience.

I frequently guest lecture about credit reporting and credit scoring at both The University of Georgia and The Westminster Schools in Atlanta. I have also taught at Emory University's Center for Lifelong Learning, where I was rated by the students as the top instructor in the Personal Finance and Investments category during the 2005-06 term. In April 2016 I began guest lecturing to 2nd and 3rd year students at the Emory University School of Law. I also volunteer my time teaching credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I received a Bachelor of Science in Criminal Justice from the University of West Georgia in June 1991. I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are set forth in my resume, which is attached as Exhibit A.

### C.    Publications

I am a frequent contributor on consumer credit issues to USA Today, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, Money Magazine, American Banker, SmartMoney, MarketWatch, CNN.com, MSNBC.com, Bankrate.com, and other regional business and consumer media outlets.

I have written the following books and training manual on the same topics, including *You're Nothing but a Number* (2007), *The GetCreditWise Tool Kit* (2007), *Surviving Identity Theft* (2007 w/ Emily Peters), and my most recent book, *The Smart Consumer's Guide to Good Credit: How to Earn Good Credit in a Bad Economy* (2012). I also published an article, *CARD Act, the good the bad and the meaningless*, in the March 2010 issue of Bank and Lending Liability Report.

I have been a full time author since late 2004 and the number of my publications to date is approximately 3,500. I currently write or have written regular articles on credit issues for newsletters, website publications, and blogs, including a monthly column, "Ask John," for Credit.com's monthly e-newsletter, *Tidbits*, for Boardroom, Inc.'s monthly newsletter, *BottomLine Personal*, and for CreditBloggers.com, Credit.com, Enloop.com, CNBC.com, IMS Expert Services Newsletter, Mint.com, SmartCredit.com, CreditSesame.com's blog, the National Foundation for Credit Counseling's Financial blog, Credit Card Insider, Sky Rocket Media, The New York Times, JD Byrider's blog, MagnifyMoney, The Simple Dollar, Zillow, and VantageScore Solutions.

### D.    Certifications

Twice, I have been Fair Credit Reporting Act (FCRA) certified by the credit reporting trade association, the Consumer Data Industry Association (CDIA), and its predecessor, the Asso-

ciated Credit Bureaus (ACB). The FCRA Certificate Program was developed to prepare consumer reporting agencies and companies that furnish information to the consumer reporting agencies to meet the requirements set forth in the FCRA. The course covers how consumers, credit grantors, and those who use and furnish information to consumer reporting agencies are affected by the FCRA.

### E.    Previous Expert Witness Work and Testimony

I have served as an expert witness in more than 270 lawsuits concerning credit issues and have been qualified to testify as an expert in both Federal and state courts. I have served as an expert for both plaintiffs and defendants, and for creditors and consumers. A list of matters on which I have testified in the last four years is attached as Exhibit B to this report.

## II.    SCOPE OF WORK

I was retained by counsel for Defendant CitiMortgage, Inc. ("Citi") and asked to provide an expert opinion on credit reporting and credit scoring generally. I was also asked to opine as to the Plaintiff's alleged damages, dispute resolution and investigation procedures, reinvestigation as it pertained to the Plaintiff, the opinions of the Plaintiff's expert witness and offer other opinions as the facts support.

## III.    COMPENSATION

I am being paid my typical rate of $445 per hour for all work performed. I have no financial interest in the outcome of this matter.

## IV.    DOCUMENTS REVIEWED

A list of documents and other information upon which I have considered and relied in forming my opinions set forth in this Report attached as Exhibit C.

## V.    SUMMARY OF OPINIONS

Having reviewed the facts and materials in this case and based on my analyses presented in this Report, it is my opinion that:

- Citi Did Not Report the Plaintiff's Mortgage Loan as Being a "Foreclosure" but Instead Accurately Reported the Subject Loan as "Foreclosure Process Started."

- The Plaintiff Did Not Suffer Any Credit Related Damages Because of Citi's Credit Reporting.

- Many of the Opinions Proffered by Thomas Tarter Are Factually Inaccurate.

## VI.    COMPLETE STATEMENT OF ALL OPINIONS AND BASIS FOR OPINIONS

### A.    Background Regarding the Credit Reporting Industry

#### 1.    Credit Reporting Agency Background

A credit report is a record of an individual's current and past financial liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments, and bankruptcies on-

ly), as well as their account history (also called "trade"). There are a number of companies that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, an insurer, or another organization with a right to view such data.

These companies are called credit reporting agencies, consumer reporting agencies, or credit bureaus. They collect and store credit data and then generate and deliver credit reports using that data in response, for example, to requests from lenders or insurance companies who have received an application for credit or to bind insurance. There are three major, commonly recognized credit reporting agencies in the United States: Equifax, Experian, and Trans Union. Equifax, a public company, is headquartered in Atlanta, Georgia. Experian, a public company in the U.K., has its U.S. headquarters in Costa Mesa, California. Trans Union, a public company, is headquartered in Chicago, Illinois. Each of the three companies maintains over 200 million credit files. There are roughly 600-675 million consumer credit files in circulation.

## 2. Data Furnisher Background

Information that is sent to the credit reporting agencies comes from companies generally referred to as "data furnishers." These companies are almost always going to be some sort of financial institution (e.g., a bank, credit union, finance company, or credit card issuer) or a debt collector. These furnishers will generally send their customer or debtor's account information to the credit reporting agencies once every statement cycle period, which is normally once per month.

The furnisher's information is normally sent to the credit reporting agencies via a magnetic tape or a system-to-system communication system. Once the credit reporting agency receives the furnisher's information, they will load it into their credit file database and disclose it on a consumer's credit report when requested.

The language furnishers use to communicate their customers' or debtors' information to the credit reporting agencies is called Metro 2. This language is the industry standard. Metro 2 consists of codes and characters which the furnisher uses to populate "cells" or data fields defined by the credit reporting agencies, and the credit reporting agencies then display the furnisher's account information on consumer credit reports and disclosures.

Every year the Consumer Data Industry Association ("CDIA") publishes a manual called the Credit Reporting Resource Guide or, informally, the Metro 2 Manual. This manual, which is approximately 290 pages, contains not only the Metro 2 language field layout but also a comprehensive list of the numerous codes used to report information to the credit reporting agencies, and a description of the conditions or scenarios when the codes should be used.

In short, while the credit-related information comes from the furnisher, the language or codes that are available to the furnisher to communicate that information and the format required for its communication are not controlled by the furnisher.

### 3.    Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company, consumer service provider or other requesting party when a consumer submits an application for some sort of benefit, such as a home loan, auto loan, credit card, subscription service, or insurance. The requestor or lender, referred to by the credit bureaus as a subscriber or user, submits a request for the consumer credit file. Using proprietary search logic, the credit bureau compiles a credit report using its stored data. This process is virtually instantaneous, giving lenders the ability to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. The report and credit score are then used by lenders to determine an individual's credit risk. The information in a consumer credit report is not "real time," meaning it is not updated dynamically.

### 4.    Credit Scoring

A credit score is a number that summarizes an individual's credit risk based on a snapshot of his or her credit report at that point in time. A credit score helps lenders evaluate an individual's entire credit report *by estimating his or her likelihood of becoming 90 days late on any credit obligation in the 24 months after the score is calculated*. The most widely used credit scores are FICO scores, the credit scores created by FICO (formerly known as Fair Isaac Corporation). Lenders can buy FICO scores from any of the three major credit reporting agencies. FICO develops its scores based on information in the consumer credit files maintained by the credit reporting agencies. A credit score may influence the credit available to the consumer and the terms that lenders offer to the consumer (e.g., interest rate, credit limits). Credit scores can be calculated using different scoring models, although FICO is the standard in the United States, Canada, and other countries that maintain sophisticated credit reporting systems.

### a.    Factors Affecting Credit Scoring

FICO scores take into account a number of credit report components. Those components that contribute to a FICO credit score and the relative weight of each (expressed as a percentage) are:

- 35% – **Payment History**: The presence or lack of negative information
- 30% – **Debt**: How much and what type
- 15% – **Length of Credit History**: How long an individual has had credit
- 10% – **Account Diversity**: The variety of credit experiences
- 10% – **Hard Inquiries**: A record of when an individual's credit report is accessed

**Payment History (35%** contribution on the FICO scale) – A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge-offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category, FICO considers the severity of the negative item (minor derogatory versus major derogatory), the age of the negative items, and the prevalence of multiple negative items.[1]

**Debt (30%** contribution on the FICO scale) – FICO considers the amount and type of debt carried by a consumer. There are three types of debt considered:

> **Revolving debt:** This is credit card, retail card, and some gas card debt. While home equity lines of credit have revolving terms, the bulk of debt considered in this category is unsecured revolving debt incurred on "plastic." The most important measurement from this category is called "Revolving Utilization," which is the relationship between the consumer's aggregate credit card balances and available credit card limits, also called "open to buy." This is expressed as a percentage and is calculated by dividing aggregate credit card balances by aggregate credit limits and multiplying the result by 100, yielding the Revolving Utilization percentage. The higher the percentage, the lower an individual's FICO score likely will be. This is why simply closing credit cards is generally not a good method for improving one's credit score. Closing one or more credit card accounts will reduce an individual's total available credit limit and, in turn, likely increase the individual's Revolving Utilization percentage, unless the cardholder also reduces their outstanding balances as well.

> **Installment debt:** This is debt where there is a fixed payment for a set period of time, such as an auto loan requiring the same payment for 36, 48, or 60 months.

> **Open debt:** This is the least common type of debt. Open debt must be paid in full each month. A certain variety of credit cards require a consumer to "pay in full" each month. The American Express Green card is a common example.

**Length of Credit History** (Credit File Age) **(15%** contribution on the FICO scale) – The older an individual's credit report, the more stable it likely is. The credit file "age" is determined by looking at (1) the date the oldest account was opened, and (2) the average age of the accounts in the credit file. The age of the credit file is measured from the oldest account's "date opened" field. The average age is calculated using the "date opened" field on all accounts, whether they are currently open or closed.

**Account Diversity (10%** contribution on the FICO scale) – An individual's credit score will benefit from having a diverse set of account types in his or her credit file. Having experience across multiple account types (revolving, auto, mortgage, etc.) benefits an individual's credit score because the individual is proving an ability to manage different types of debt.

---

1. In the FICO and VantageScore scoring systems, a severe or major derogatory is anything that is currently past due, historically 90 days past due or worse, a public record, a collection, or any account status or narrative that indicates default or severe delinquency (e.g., repossession, foreclosure, settlement/short sale, charge-off).

**Hard Inquiries (10%** contribution on the FICO scale) – An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the creditworthiness of a consumer (including so-called "soft inquiries") can stay on a credit report for as little as 6 months and are never visible to lenders or credit scoring models. There are several types of soft inquiries:

- Prescreening or promotional inquiries, where a credit bureau may sell contact information to credit card companies, lenders, or insurers for consumers who meet criteria set by the inquirer. Pre-approved credit card offers are mailed to consumers identified through a prescreening or promotional inquiry.

- Creditors check current customers' credit files on a periodic basis through an account management, account maintenance, or account review inquiry.

- When a consumer checks his or her own credit report it is referred to as a consumer disclosure inquiry.

- Employment screening inquiries.

- Insurance related inquiries.

- Utility related inquiries.

Other types of inquires (known as "hard inquiries") can have an impact on the creditworthiness of a consumer. These inquiries are visible to lenders and credit scoring models. These inquiries usually result from a lender requesting a consumer's credit report when the consumer applies for an extension of credit. Hard inquiries can, but do not always, affect the borrower's credit score. Limiting the number of credit inquiries can help a consumer's credit score.

### b.    Scoring Models

#### i.    Multivariate Systems

Credit scoring models are multivariate, meaning they evaluate a variety of information on a credit report to generate a final score. No single credit item determines an individual's credit score. In fact, the impact of any one item on an individual's credit score is dependent on all of the other items on his or her credit report.

#### ii.    Multi-Scorecard Systems

Credit scoring models are actually a consolidation of multiple credit scoring systems called scorecards. A scorecard is a credit scoring model designed to evaluate the risk of a group of consumers who have certain similarities in their credit file (homogenous populations). For example, a consumer with a bankruptcy on his credit report is scored using a model or scorecard designed specifically to evaluate the credit risk of consumers who have filed bankruptcy. Similarly, a consumer with limited credit information (known as a "thin file") is scored using a model or scorecard designed to evaluate the credit risk of consumers with thin files. Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels. The selection of the appropriate scorecard is made by the credit scoring system prior to calculating and rendering a final score.

### iii.    Characteristics, Variables, and Weights

Each scorecard contains a series of characteristics, variables, and weights. A characteristic is a question asked of the credit report by the scoring system. For example, a common characteristic in most credit risk models asks, "how many accounts with a balance are present?" Other examples include:

- Does the consumer have any delinquencies on his or her credit report?
- How long has it been since the consumer's most recent delinquency?
- Does the consumer have a bankruptcy on his or her credit report?

While these examples are plain English questions, credit scoring systems answer the questions by reading the data embedded in the credit report. Scorecards regularly use at least 12 characteristics, and, in some cases, significantly more.

Each characteristic has what are referred to as variables. Variables are the series of available answers to the characteristics (or questions). The set of potential variables (or answers) to the sample[2] characteristics above might be:

- Does the consumer have any delinquencies on his or her credit report?
  (Yes or No)

- How long has it been since the consumer's most recent delinquency?
  (Less than 36 months ago or More than 36 months ago)

- Does the consumer have a bankruptcy on his or her credit report?
  (Yes or No)

And, while these examples are pretty simple ones, most characteristics have a much larger set of available variables.

Once the credit scoring system has completed the process of selecting the scorecard and determining the proper variable for each characteristic in that scorecard, the model assigns weights or points to each variable. For example, the model might assign points as follows:

- Does the consumer have any delinquencies on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 100.
  If the answer is No, 100 points are awarded out of 100.

- How long has it been since the consumer's most recent delinquency?
  If the answer is Less than 36 months ago, 25 points are awarded out of 75.
  If the answer is More than 36 months ago, 75 points are awarded out of 75.

- Does the consumer have a bankruptcy on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 50.
  If the answer is No, 50 points are awarded out of 50.

---

2 The preceding and following characteristic and variable breakdowns, as well as the weights assigned on this report are EXAMPLES and do not represent the reality of any credit scoring system. These examples are simply meant to illustrate how a credit-scoring model considers information on a credit report.

Once the model has assigned weights or points to each variable, the points are tabulated, resulting in a final credit score. The entire process is computerized and can be accomplished rather quickly. The credit score is usually appended to a credit report and delivered to the lender for use in risk management decisions.

### 5.   How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users" or "subscribers"). Data users attempt to measure the downside financial risk of doing business with a particular consumer against upside gain if the product being offered to the consumer is priced appropriately. For example, if a consumer presents little risk, a lender can be more aggressive with the interest rate it offers because the consumer's credit score suggests that the consumer will pay on time. If a consumer presents a higher risk, the lender may decline the application or charge a higher interest rate in order to subsidize the risk posed by extending a loan to that consumer. Credit reports and credit scores have become synonymous with credit risk and risk-based pricing.

### 6.   The Dispute Resolution Process

A consumer can challenge information on a credit report by contacting the credit reporting agencies or furnishing party, although the consumer's rights may be different depending on who he or she contacts. A consumer can file a dispute with the credit reporting agencies on their websites, by U.S mail, telephone, or in person.

When a dispute is filed with a credit bureau, several things happen. First, the credit bureau reviews the relevant information sent by the consumer regarding the dispute.  This allows the credit bureau to determine the nature of the dispute, such as whether it's fraud related, a mixed or confused credit report issue, a credit clinic dispute, or some other type of dispute. Once the nature of the dispute is identified the credit bureau will direct to the appropriate group.

The item in dispute is marked on the credit report as being "in dispute" by appending a specific code to the disputed item. This Compliance Condition Code[3] is represented by the letters "XB." When an XB code appears next to an item in a credit report, that particular item is excluded from any credit score characteristics that measure payment history or debt until the dispute is resolved or closed and the XB code is removed. This allows the credit reporting agency and data furnisher to conduct the requested investigations without the disputed item impacting the consumer's credit score.

When the dispute is received by the credit reporting agency, a dispute code is assigned. These dispute codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID."

---

[3] A Compliance Condition Code ("CCC") is one of the variety of codes in the Metro-2 credit reporting language. According to the Credit Reporting Resource Guide, a CCC "allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act or the Fair Credit Billing Act."

These codes and other consumer information are then pre-populated on a form called an Automated Consumer Dispute Verification (ACDV) and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." Recently e-OSCAR has been modified so that documents sent by the consumer to the credit reporting agencies can be attached to the ACDV communication sent to the furnisher of the information. Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute.

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to his or her credit report or if the challenged item is accurate. Either way, the data furnisher should fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, or leave the item unchanged. The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or do nothing to the entry.

The credit bureau then sends correspondence, usually by mail, to the consumer with the results of the investigation. Under the Fair Credit Reporting Act, this entire process may take up to 45 days, although the Consumer Data Industry Association (CDIA) reports that the process generally takes less time thanks to automation.

It is not uncommon for consumers to hire 3rd party companies to attempt to have negative information removed from their credit reports prematurely under false pretenses. These Credit Repair Organizations or Credit Services Organizations charge fees to dispute information on consumer credit reports, a process the credit reporting industry's trade association has referred to as "Jamming." According to Stuart Pratt, former President of the credit reporting industry's trade association, between 30-50% of all consumer disputes are being submitted by credit repair companies, most of them frivolous attempts to have accurate but negative information removed from consumer credit reports.

### 7. The Fair Credit Reporting Act, Adverse Action and Risk Based Pricing Notices and Investigations

The Fair Credit Reporting Act ("FCRA") is the federal statute that defines, among other things, when credit reports can be accessed, consumer's rights, obligations of the credit bureaus and their data furnishers to perform reasonable investigations, and various notice requirements.

For example, when a consumer applies for and is denied a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a notice of adverse action, more commonly referred to as a declination letter. This letter is not optional but is rather auto-pilot, meaning the applicant doesn't have to overtly request the letter after they've been denied.

The notice must contain certain elements including the applicant's credit score, from what credit bureau the lender obtained the credit report, the credit bureau's address, and a notice of a consumer's right to obtain a free copy of their credit report because of the declination.

Further, when a consumer applies for and is adversely approved[4] for a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a Risk Based Pricing notice. This letter, like the adverse action letter, is auto-pilot. The absence of adverse action or risk based pricing notices means the applicant was approved and given a lender's best available terms.

The FCRA also obligates the credit reporting agencies and their data furnishers to perform investigations when they've been put on notice that the consumer challenges the accuracy of information on their credit reports.  There is no statutory standard of what constitutes a "reasonable" investigation in the FCRA and what is reasonable will depend on the facts and nature of the consumer's dispute.

Most furnishers of information will review the dispute form submitted by the credit bureaus, review their internal records, access multiple systems containing account related information, and will also have access to review any attachments to the dispute which the consumer may have included with their communication to the credit bureau(s). This is a common method of investigation by a furnisher.

> **B.     Opinion #1 – Citi Did Not Report the Plaintiff's Mortgage Loan as Being a "Foreclosure" but Instead Accurately Reported the Subject Loan as "Foreclosure Process Started."**

The Plaintiff contends in her Complaint and in her deposition testimony that Citi reported a "foreclosure" on her credit reports.  This is incorrect.  Citi instead reported that it had begun foreclosure proceedings, which is considerably different than reporting a foreclosure had taken place.

There are a variety of ways for Citi and other mortgage lenders and servicers to report foreclosure related entries to the consumer credit reporting agencies. A loan can be reported as "foreclosure process started" using something called a Special Comment Code (SCC). The SCC for "foreclosure process started" is represented by the letters "BO." Citi reported the BO code associated with the Plaintiff's subject mortgage loan indicating that the foreclosure process had been started, which is factually accurate as evidenced by Citi's own letter communication with the Plaintiff[5], which she recalls receiving[6], and Citi's foreclosure agent's communications with the Plaintiff[7].

A loan can be reported as "Account paid in full. A foreclosure was started" using something called an Account Status Code. The Account Status Code for "Account paid in full. A foreclosure was started" is represented by the number "65." Citi reported the Account Status Code 65 associated with the Plaintiff's subject mortgage loan indicating a foreclosure was started and the account had been paid in full. Account Status Code 65 and Special Comment Code

---

[4] An Adverse Approval is an approval for credit, but not with the lender's best terms.

[5] See Robbins 30 and Exhibit B to the Plaintiff's deposition.

[6] See page 48 of Plaintiff's deposition transcript.

[7] See Robbins 2.

BO are interchangeable as they have the same meaning as it pertains to the foreclosure process being started.

There are separate and different codes indicating that a foreclosure had been completed. For example, the Payment History Profile code "H" indicates, "Foreclosure Completed." And, Account Status Code 89 indicates, "Foreclosure completed." Neither of these codes was UNDER reported by Citi or associated with the Plaintiff's subject loan. As such, Citi never reported that their loan had been "foreclosed." All references in the Complaint, the Plaintiff's expert's report, the Plaintiff's deposition, and the February 2017 letter from Brad Ludes that Citi reported a foreclosure had taken place are factually inaccurate.

The existence of codes that result in foreclosure (past tense) credit reporting is evidence that there are alternate methods of reporting a foreclosure across its various stages. In fact, the credit reporting industry's own credit reporting standards' manual or "CRRG" [8] provides guidance on when the various foreclosure codes should be reported. The codes used by Citi in their reporting (BO and 65) are both to be used when the foreclosure process has been started.

Finally, there is no language in the standards' guidelines indicating that a Notice of Default must be filed prior to the reporting of the "foreclosure process started" language. In fact, it is very common for furnishers to report the "foreclosure process started" language well in advance of a Notice of Default being filed and even in the absence of a Notice ever being filed as the Notice filing is not a recognized milestone. The Plaintiff and her expert seem to be attempting to create non-existent foreclosure reporting standards by tying the credit reporting to the act of filing a Notice of Default.

The below screen captures are from the CRRG and represent the reporting guidelines for when the foreclosure process started codes are to be used. As you can see, there is no mention of a Notice of Default or any requirement for a Notice of Default to be filed prior to the below credit reporting. In fact, the term "Notice of Default" is nowhere to be found in the 306 pages of the CRRG. The Plaintiff and her expert are simply making up credit reporting standards by suggesting the Notice must be filed in advance of any foreclosure related credit reporting.

**Foreclosure Started** – Special Comment Code **BO** should be reported, which specifically says "Foreclosure proceedings started". This special comment should be reported each month as long as the comment applies. The appropriate Account Status Code should be reported in conjunction with this special comment, such as Account Status Code 82 for 120 – 149 days past the due date.

**Foreclosure Started / Now Paid** – Account Status Code **65** should be reported when foreclosure proceedings had been started, but the consumer subsequently paid the account balance in full. Account Status 65 specifies "Account paid in full. A foreclosure was started". The appropriate Payment Rating should be reported in conjunction with this Account Status.

---

[8] This standards' guide is called the Credit Reporting Resource Guide or "CRRG." It is often informally referred to as the Metro 2 Manual.

### C. Opinion #2 – The Plaintiff Did Not Suffer Any Credit Related Damages Because of Citi's Credit Reporting.

The Plaintiff contends she has suffered various credit related damages because of Citi's "Foreclosure" credit reporting. Notwithstanding the fact that Citi never reported the Plaintiff's mortgage loan as being "Foreclosed", evidence suggests the Plaintiff's alleged credit related difficulties were not caused by Citi's credit reporting. Specifically, and not in any particular order, the Plaintiff contends she was "unable to qualify for a loan (auto loan)" and "unable to purchase a home."[9]

On or about September 13, 2012 the Plaintiff applied for automotive credit with Ally Bank via Surf City Auto Group[10]. Contrary to the Plaintiff testimony, this application for credit was **not** denied. Ally Bank, instead, made a counter offer to the Plaintiff which was communicated to Surf City Auto Group. Nonetheless, Ally Bank's decision to not deny the Plaintiff's application and submit a counter offer was based on information in the Plaintiff's Equifax credit report, including the Plaintiff's credit score.

The Plaintiff's credit score at the time of the application was 689, which is roughly 11 points below the national average. The Plaintiff's credit score wasn't higher for a variety of reasons clearly communicated in Ally Bank's letter as being:

Serious Delinquency
Time Since Delinquency is Too Recent or Unknown
Number of Accounts with Delinquency
Length of Time Accounts Have Been Established
Inquiries

There is no Equifax credit report from either 2012 or 2013 as part of the production documents so there is no way to know for certain what information was contained in the Plaintiff's Equifax credit report at the time Ally Bank pulled it. There is, however, information from Equifax as of 08/28/2014[11] indicating the Plaintiff had record of a NUVISION account that was being reported as a "Paid Charge off" and a Citi mortgage loan that was being reported as an "Account Paid After Foreclosure Started." Both seriously derogatory entries were reported as of May 2012. And, in the case of the Citi account the credit reporting is fully accurate given the reasons listed in my Opinion #1 above.

The unrelated NUVISION account is a severely derogatory account or "major derog" as I more fully explain in my Footnote #1. As such the reasons given by Ally Bank in its letter would still have been present even in the absence of the subject Citi loan "foreclosure process started reporting." Incidentally, and more fully explained below, because the Citi ac-

---

[9] See Plaintiff's deposition, pages 79-80.

[10] See Robbins 37.

[11] See Robbins 96.

count had already gone over 120 days past due, a fact that is undisputed, it was already considered as a "major derog."

On or about September 2, 2012, the Plaintiff applied for automotive financing, which resulted in a credit inquiry by JP Morgan Chase[12]. The Plaintiff's application was denied. Only one page of the multi-page letter from Chase was produced but it appears Chase denied the Plaintiff's application, in part, because of information appearing on her Equifax credit report. And as with the Ally Bank application scenario, we do not have an Equifax credit report from the same time frame.

The Chase letter does refer to two reasons for their denial decision, "Foreclosure" and "Unable to Verify Residence." As of May 2012, the Plaintiff's Equifax credit report contained a record of "Account Paid After Foreclosure Started", which as stated above in my Opinion #1, was accurate credit reporting and does not indicate that a foreclosure took place.

The fact that Chase also denied the Plaintiff's application because they could not verify the Plaintiff's residence suggests Chase would not have approved the Plaintiff's application regardless of any information appearing on her credit reports as lenders don't generally approve credit applications without a validated address. There's no way to repossess an automobile for non-payment if the bank does not know where the borrower lives.

Finally, the Plaintiff contends in her Complaint paragraph 55 that she attempted to obtain goods or services only available to consumers with satisfactory credit reports and said goods were denied due in part to Citi's trade line. Plaintiff makes a similar assertion in paragraph 57 of the Complaint, "Plaintiff has been unable to utilize credit opportunities only available to those with strong credit ratings." The problem with these two assertions is the Plaintiff didn't have "satisfactory credit reports" or "strong credit ratings" even in the absence of Citi's "foreclosure process started" credit reporting.

The above-mentioned NUVISION account, which is unrelated to Citi, was reported as being a charged off loan and a short sale[13]. Charge offs are major derogatory entries and they can lead to unsatisfactory credit reports and lower credit ratings/scores. Further, and equally important, the Plaintiff admitted that she had stopped making payments on the Citi loan[14], resulting in Citi accurately reporting the loan as being at least 120 days past due. Being late by 120 days can lead to unsatisfactory credit reports and lower credit ratings/scores. The accuracy of the credit reporting surrounding late payments on the account is not in dispute.

Finally, the presence of a charged off account or short sale AND an account that is 120 days past due can compound the negative impact on a consumer's credit rating. Point being, even in the absence of Citi's "foreclosure process started" reporting the Plaintiff didn't have a satisfactory credit report or a strong credit rating.

---

[12] See Robbins 38.

[13] See Robbins 46.

[14] "I missed payments, I acknowledge that", page 120 of Plaintiff's deposition. And page, 131.

Note: In the Plaintiff's Complaint, she takes the position that the Citi account should be reported as a short sale[15]. However, there was no short sale on the Citi account. The short sale occurred on the NUVISION account rather than on the Citi account. In fact, the Plaintiff asked Citi to change its credit reporting of the subject loan to a short sale, which would have been equally derogatory to the foreclosure process started comment[16].

Regardless of whether the Citi account was reported as a short sale, foreclosure process started, foreclosure completed, or simply 120 days past due, each scenario is considered an equal "major" derogatory incident. As such the impact to her credit scores would have been consistent across each scenario.

### D.    Opinion #3 – Many of the Opinions Proffered by Thomas Tarter Are Factually Inaccurate.

The Plaintiff's expert has proffered opinions pertaining to Citi's credit reporting and the Plaintiff's alleged credit related damages. Mr. Tarter appears to be of the opinion that Citi did not follow industry standards by furnishing a foreclosure trade line to the credit bureaus even though no Notice of Default was ever filed, that Citi's credit reporting caused damages, and that Citi did not follow industry standards in its investigations.

The Plaintiff doesn't hold herself out as a credit expert. As such her continued misuse of the term "foreclosure" is understandable. The Plaintiff's expert, however, is holding himself out as being a credit expert and his continued and conscious misuse of the word is unacceptable as there is no evidence in the considerable production documents that Citi ever reported that a foreclosure took place.

Mr. Tarter makes no mention in his report of the Credit Reporting Resource Guide or the Metro 2 manual, which is the only set of credit reporting standards in the credit industry. In fact, Mr. Tarter doesn't cite to any set of standards in his report, let alone the actual credit reporting standards. In the "Documents reviewed" section of his report there is no mention of the Credit Reporting Resource Guide so it's hard to believe Mr. Tarter based his credit reporting "standards" opinions on the actual credit reporting standards.

Further, Mr. Tarter simply states that Citi caused damages but provides nothing further[17]. Mr. Tarter makes no mention of the Ally Bank or Chase letters in production. And, Mr. Tarter simply parrots the Plaintiff's assertion that she was unable to qualify for a mortgage loan[18], of which there is no evidence she applied. The Plaintiff was simply told by a mortgage broker that she would not qualify for a mortgage loan.[19]

---

[15] See Complaint, paragraph 27.

[16] See Plaintiff's deposition transcript, page 29.

[17] See Tarter Report page 15.

[18] Ibid, page 18.

[19] See Plaintiff's deposition transcript, pages 59-60, and 84 and 89.

Finally, as it pertains to industry standards and Citi's reinvestigation process, Mr. Tarter doesn't know what Citi did to investigate the Plaintiff's dispute. He makes no mention of reviewing any document that describes the process Citi took to investigate the Plaintiff's dispute. In fact, Mr. Tarter admits in his report that he hasn't seen any ACDVs in the "Important Information Has Not Been Produced[20]" section of his report. I, on the other hand, have reviewed the 4 ACDVs and the 3 AUDs produced in this matter as they were important to my opinion that Citi did, in fact, follow industry standards in their investigations.

ACDVs memorialize the dispute resolution process findings. It seems premature for Mr. Tarter to simply conclude that Citi didn't follow industry standards when he hasn't reviewed the one and only form created when a consumer files a dispute with the credit reporting agencies. The same is true for AUDs.  Mr. Tarter doesn't cite to any AUD forms, which are the one and only form that is created when a consumer files a dispute with the furnisher of information.

Mr. Tarter simply dismisses Citi's process because "his experience" indicates its process "really wasn't anything more than confirmation[21]" rather than attempting to learn exactly what Citi did do in response to the Plaintiff's disputes.

*      *      *      *      *

This expert report is based on my 25-plus years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com, and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which includes more than 270 cases. All of my comments are accurate to the best of my knowledge as of the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty.

I reserve the right to supplement or amend my opinions. I declare that the foregoing is true and accurate to the best of my ability based on the documents I have reviewed, my education, my experience, my training, and my expertise.

Executed this 10th day of August 2017, in Atlanta, Georgia



John Ulzheimer

---

[20] See Tarter Report, page 9.

[21] Tarter Report, page 14.

**Exhibit A**

### John Ulzheimer

### The Ulzheimer Group, LLC, President
### 1160 Buckhead Valley Court
### Atlanta, Georgia 30324
### (404) 636-3737

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FCRA, FDCPA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is twice FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has 25+ years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and years of concurrent work with a number ofs consumer credit related companies.

John currently is or was the credit blogger for the New York Times, Mint.com, CreditSesame.com, CreditSimple.com, CreditCardInsider.com, JD Byrider Systems, Credit.com, SmartCredit.com, VantageScore Solutions, The Simple Dollar and the National Foundation for Credit Counseling. John has been published and quoted over 3,500 times in the past 12 years on the topic of consumer credit. He has authored or created numerous educational materials on the subject including:

- The book, *The Smart Consumer's Guide to Good Credit*
- The book, *You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies.*
- The consumer handbook, *Surviving Identity Theft.*
- The consumer handbook, *The Get Credit Wise ToolKit*

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, TransUnion, TransUnion Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, and members of Congress, consumer groups and consumers.

John frequently appears on CNBC, FOX News, CNN and NPR. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, The Motley Fool, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The Westminster Schools, The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. In April 2016 John began guest lecturing at Emory University's School of Law. John graduated in 1991 from The University of West Georgia with a B.S. degree in Criminal Justice.

**Certifications and Awards:**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

**Graduate – American Bankers Association School of Bankcard Management held at The University of Delaware – 2000**

**2014 Consumer Advocate Award – National Foundation for Credit Counseling.**

## Exhibit B

## Expert Testimony in the Last Four Years

***Sokiranski v Reliant Support Service*** – Deposition (USDC, N Dist of OH 1:12-cv-01624)
***Cruz v Covert*** – Trial (Supreme Ct of NY, Suffolk Co. Index No. 004802)
***Thompson v Wells Fargo*** – Trial (Jefferson Circuit Court, Kentucky Div 2, 11-CI-04347)
***Edmondson v Flagstar Bank*** – Deposition (USDC Northern Dist. of AL, 12-J-03638)
***Gardner v Gardner*** – Trial (3rd Judicial Dist Ct of Salt Lake City, UT 914900261)
***Marchman v AHMSI*** – Deposition (Dist Ct of Harris Co, TX 2012:09917)
***LeBourgeois v Allied Home Mortgage*** – Deposition (Civil Ct, Orleans Parrish 08-2705)
***Russo v Bank of America*** – Deposition, Trial (Sup Ct of San Diego, 37-2012-95724)
***Pettway v Wells Fargo*** – Deposition (USDC Northern Dist of AL, 2:12-CV-03797)
***Pele v PHEAA*** – Deposition (USDC East Dist of VA, 1:13CV1531)
***Davidson v Capital One*** – Deposition (USDC So Dist of FL, 14-20478-CIV)
***Skagerberg v Wells Fargo*** – Deposition (Dist Court of Harris Co, TX 2011-52554)
***Marchisio v Carrington Mortgage*** – Deposition (USDC So Div of FL, 2:14-cv-14011)
***Noori v Bank of America*** – Deposition (USDC Cent Dist of CA, cv15-01467-AB)
***Kealy v Ford Motor Credit*** – Deposition (Sup Ct of CA, LA County BC497696)
***Best v Bluegreen*** – Deposition (USDC So Dist of FL 14-80929-civ-cohn)
***Callaly v Lieberman Management*** – Deposition (Circ Ct, Du Page Co, IL. 11L545)
***Vasquez-Estrada v Collecto, Inc*** – Deposition (USDC Dist of OR, 3:14-cv-01422)
***Boydstun v US Bank*** – Deposition (USDC Dist of OR, Portland Div 3:11-cv-429)
***Duell v FNBO*** – Deposition (USDC So Dist of CA, 14-cv-2774)
***Daugherty v Equifax, et at*** – Trial (USDC So Dist of WV, Beckley Div 5:14-24506)
***Neal v Trans Union, et al*** – Deposition (USDC West Dist of MO, 6:15-cv-03474)
***Barakat v Capital One, et al*** – Deposition (USDC East Dist of MI, 16-cv-10718)
***Harrah v SLS*** – Deposition (USDC East Dist of VA, 4:15cv95)
***Robinson v Wells Fargo*** – Deposition (USBC Southern Dist of TX, 14-03290)
***Thompson v Wells Fargo*** – Deposition (Jefferson Circuit Court, Div 6, 11-CI-04347)
***Jones v PHEAA*** – Deposition (USDC Cent Dist of CA, 2:16cv-00107)
***Ogden v International Paper*** – Deposition (Dist Ct of Jefferson Co., TX B-195,960)
***Bastek v Comenity Bank*** – Deposition (Sup Ct of CA, San Diego Division, 37-2016-17012)
***Filion v Wells Fargo*** – Deposition, Trial (Sup Ct of CA, Ventura Co, 56-2013-00424511)
***Welch v Fireman's Fund*** – Deposition (Sup Ct of WA, King Co. 09-2-32462-0)

**Exhibit C**

## Documents Reviewed

Complaint
Expert Report of Tom Tarter
Deposition of Ms. Robbins, including Exhibits
Plaintiff's Production Documents
Various Editions of the Credit Reporting Resource Guide

# EXHIBIT G

April 23, 2015

<u>VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED</u>
Equifax Information Services, LLC
P.O. Box 740256
Atlanta, GA  30348

RE:    Jacalyn Robbins
       Address:              REDACTED      REDACTED

       Credit Report Confirmation No: REDACTED1654
       Report Date: April 23, 2015

Dear Equifax:

The above referenced credit report is inaccurate and I dispute its contents.  You are continuing to report inaccurate information that adversely affects my ability to secure new credit.  In particular I dispute the following account information:

**CitiMortgage, Account No.** REDACTED1727...  The property secured by this loan was never in foreclosure while I was the property owner.  It should not be in the "adverse accounts" section of my credit report.  Specifically:
- Comments: Account paid after foreclosure started
- Pays 90-120 Days

This is inaccurate, is interfering with my efforts to obtain credit, is causing financial damage to me and should be removed immediately.

California Civil Code Section 2924 requires that the trustee file a Notice of Default at the County Recorder's Office in order to initiate foreclosure.  Enclosed with this letter is a search from the Orange County Recorder's website that shows that no notice of default was ever filed in my name during the life of this loan.

I am requesting a complete investigation of the disputed items and that corrections be promptly made to my credit file.  Please send me an updated credit report reflecting the corrections indicated above within 30 days from the date of this letter (or sooner).

Sincerely,


Jacalyn Robbins

Enclosures



April 23, 2015

<u>VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED</u>
Experian
P.O. Box 4500
Allen, TX  75013

RE:   Jacalyn Robbins

                                              **REDACTED**
                                              **REDACTED**



Credit Report No: <sup>REDACTED</sup>71-65
Report Date: April 23, 2015

Dear Equifax:

The above referenced credit report is inaccurate and I dispute its contents.  You are continuing to report inaccurate information that adversely affects my ability to secure new credit.  In particular I dispute the following account information:

**CitiMortgage, Account No.** <sup>REDACTED</sup>1727...  The property secured by this loan was never in foreclosure while I was the property owner.  It should not be in the "adverse accounts" section of my credit report.  Specifically:

- Payment History: FS in May 2012, 120 in Apr, 90 in Mar;
- Account History: Foreclosure proceedings started as of May 2012, 120 days past due, 90 days past due;
- Comment: Foreclosure proceedings started.

This is inaccurate, is interfering with my efforts to obtain credit, is causing financial damage to me and should be removed immediately.

California Civil Code Section 2924 requires that the trustee file a Notice of Default at the County Recorder's Office in order to initiate foreclosure.  Enclosed with this letter is a search from the Orange County Recorder's website that shows that no Notice of Default was ever filed in my name during the life of this loan.

I am requesting a complete investigation of the disputed items and that corrections be promptly made to my credit file.  Please send me an updated credit report reflecting the corrections indicated above within 30 days from the date of this letter (or sooner).

Sincerely,

Jacalyn Robbins

Enclosures

April 23, 2015

VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
TransUnion
Consumer Dispute Center
P.O. Box 2000
Chester, PA  19022-2000

RE:   Jacalyn Robbins
       Credit Report No: REDACTED 5095
       Report Date: April 23, 2015
       SSN: REDACTED 5740
       Birth Date: REDACTED
       Address:                    REDACTED
       Mailing Address:                    REDACTED

Dear TransUnion:

The above referenced credit report is inaccurate and I dispute its contents.  You are continuing to report inaccurate information that adversely affects my ability to secure new credit.  In particular I dispute the following account information:

**CitiMortgage Inc, Account No.** REDACTED **1727...**  The property secured by this loan was never in foreclosure while I was the property owner.  It should not be in the "adverse accounts" section of my credit report.  Specifically:
- Remarks: Foreclosure Initiated, Foreclosure Started
- Pay Status: Account 90 Days Past Due Date, Maximum Delinquency of 120 days
- Rating: 120 in 4/2012 and 90 in 3/2012

This is inaccurate, is interfering with my efforts to obtain credit, is causing financial damage to me, and should be removed immediately.

California Civil Code Section 2924 requires that the trustee file a Notice of Default at the County Recorder's Office in order to initiate foreclosure .  Enclosed with this letter is a search from the Orange County Recorder's website that shows that no notice of default was ever filed in my name during the life of this loan.

I am requesting a complete investigation of the disputed items and that corrections be promptly made to my credit file.  Please send me an updated credit report reflecting the corrections indicated above within 30 days from the date of this letter (or sooner).

Sincerely,


Jacalyn Robbins

Enclosures


16-cv-4732 LHK                                                                                    Robbins_0008

1    A.   Yes.

2    Q.   And what are these documents?

3    A.   (Witness reviewing document.)

4         These are the certified letters I sent to the

5    Credit Bureaus.

6    Q.   And at the time you sent these, did you also

7    believe that the report of your credit was inaccurate

8    because of the amount of days past due?

9    A.   Yes.

10   Q.   And are you still claiming that that was

11   inaccurate or has that been clarified in some way?

12   A.   That's still in discussion.

13   Q.   So you're not sure whether or not the pay status

14   and the amount due -- I'm sorry, the days past due is

15   being reported accurately or not?

16   A.   Correct.

17        MR. LOKER:  Legal conclusion.  Calls for expert

18   testimony.

19   BY MS. WHITWORTH:

20   Q.   And just to clarify, to make sure that I have

21   this correct, your last payment you said you believe was

22   in December of 2011; is that correct?

23   A.   Yes.

24   Q.   And the sale of your home was May 22nd, 2012; is

25   that correct?

# EXHIBIT H

1

## AL-WESTERN RE ONVEYAN E ORPORATION

525 EAST MAIN STREET
.O. BOX 22004
EL CAJON CA 92022-9004

JACALYN ROBBINS

**REDACTED**

April 13, 2012

Reference #: ᴿᴱᴰᴬᶜᵀᴱᴰ31-15
Property Address:

**REDACTED**

ear JACALYN ROBBINS:

## OUR MORTGAGE LOAN HAS BEEN
## REFERRED TO OUR FIRM FOR FORECLOSURE

CITI ORTGAGE, INC. has referred your loan to us for foreclosure. While the foreclosure process has begun, you may still have foreclosure prevention alternatives available to you.

CITI ORTGAGE, INC. may have sent to you one or more Borrower Solicitation Packages.

You can still be evaluated for alternatives to foreclosure even if you have previously shown no interest.

You should contact CITI ORTGAGE, INC. to obtain a Borrower Solicitation Package.

You must submit a Borrower Response Package to CITI ORTGAGE, INC. to request consideration for available foreclosure prevention alternatives.

Contact Information for CITI ORTGAGE, INC. for obtaining a Borrower Solicitation Package and for submitting a complete Borrower Response Package is as follows: (866)272-4749.

The amount due as to the above-referenced loan number is $5,578.20 as of April 13, 2012. To obtain an updated amount, please contact: (619)590-9200.

The creditor to whom the amount due is owed is: CITI ORTGAGE, INC. on behalf of FEDERAL NATIONAL ORTGAGE ASSOCIATION.

This letter is an attempt to collect a debt and any information obtained from you will be used for that purpose.

Unless you notify us at the address set forth above within 30 days after receiving this notice that you dispute the validity of the debt or any portion thereof, we will assume this debt is valid. If you notice that you dispute this debt, we will obtain a verification of the debt from the lender and mail you a copy.

If you make a request to us in writing within 30 days after receiving this notice, we will provide you with the name and address of the original creditor.

Thank you.

CAL-WESTERN RECONVEYANCE CORPORATION



```
 1      A.   No.

 2      Q.   What happened to those notes?

 3      A.   I lost my email.

 4      Q.   So were your notes taken on your email?

 5      A.   (Nodding head.)

 6      Q.   And how did you lose your email?

 7      A.   I moved, and Cox took away my account.  And I

 8 didn't save them -- I didn't think to save them.

 9      Q.   And when was that?

10      A.   May 2012.

11           MS. WHITWORTH:  I'm going to mark this as

12 Exhibit C (indicating).

13           (Deposition Exhibit C was marked.)

14 BY MS. WHITWORTH:

15      Q.   Do you recognize this document (indicating)?

16      A.   Yes.

17      Q.   And what is it?

18      A.   This is a letter from Cal-Western Reconveyance

19 Corporation.

20      Q.   And did you receive this document --

21      A.   Yes.

22      Q.   -- in the mail?

23           And what did you understand this document to

24 mean when you received it?

25      A.   That the mortgage loan has been referred to this
```

1    firm for foreclosure.

2       Q.   And do you remember reading that when you

3    received this document?

4       A.   Yes.

5       Q.   And other than the exact wording of what it

6    says, did you have any other understanding of what this

7    meant?

8       A.   No.

9       Q.   But you did see where it said, "CitiMortgage has

10   referred your loan to us for foreclosure"

11      A.   Uh-huh.

12           MR. LOKER:  And that was a "yes," for the

13   record?

14           THE WITNESS:  Yes, yes.

15           MR. LOKER:  Okay.

16   BY MS. WHITWORTH:

17      Q.   When did you receive this document?

18      A.   April 2012.

19      Q.   And do you see where this document says that the

20   foreclosure process has begun?

21           MR. LOKER:  Asked and answered.  It speaks for

22   itself.

23           THE WITNESS:  Could you point me to where on the

24   letter it is?

25   //

# EXHIBIT I

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | CitiMortgage | Fax: | 866-675-5772 |
| From: | Jacalyn Robbins | Date: | 8/28/2014 |
| Re: | Loan # : REDACTED 1727 | Pages: | 4, total including cover |
| cc: | | | |

˒ Urgent       ˒˒ For review       ˒˒ Please comment       ˒˒ Please reply       ˒˒ Please recycle

To Customer Service – urgent request-

I am writing to request your <u>immediate assistance</u> in correcting the reporting of a CitiMortgage loan I previously held, that has been erroneously reported. I am in the midst of refinancing a current CitiMortgage loan and am at risk of losing approval due to the incorrect reporting to the credit agencies of my previous loan.

<u>I sold my condo via a short sale</u> in May 2012. There was minimal deficiency on the loan (CitiMortgage loan # : REDACTED 1727. Property address: ˉ ˙ ˉ        REDACTED     ˉ˙ REDACTED ). <u>It was definitely NOT a foreclosure</u>.

I am sending you: 1) cover page of the credit report 2) the page with the issue I am disputing, and 3) a page with the contact info of the reporting agencies.

I have highlighted the loan information. You will see in the middle of the page it is coded XPN1: Foreclosure procedure started and TU1: Foreclosure proceeding discontinued.

This was a short sale – NOT a foreclosure. There should not be any reference to foreclosure being reported – this is inaccurate and needs to be corrected.

What I need your immediate assistance with are 2 things:

1. Write a letter, signed on CitiMortgage letterhead, referencing the above account number and stating that it never went to foreclosure.

2. For CitiMortgage to communicate this to the credit bureaus immediately.

Please confirm receipt of this fax. My phone number is: REDACTED. My email is:
REDACTED

Thank you!



Robbins_0018

1    A.   I believe I did.

2         MS. WHITWORTH:  I want to show you a document.

3         We'll mark this as Exhibit A (indicating).

4         (Deposition Exhibit A was marked.)

5    BY MS. WHITWORTH:

6    Q.   Do you recognize this document, Ms. Robbins

7    (indicating)?

8    A.   Yes.

9    Q.   And what is this?

10   A.   This was, I believe, my initial request to

11   CitiMortgage to correct the Credit Bureau reporting.

12   Q.   And do you see in the second paragraph, it's

13   underlined, where it says, "I sold my condo via a short

14   sale"?

15   A.   Yes.

16   Q.   And do you remember writing that?

17   A.   Yes.

18   Q.   And did you believe that your condo had been

19   sold via a short sale?

20   A.   Yes.

21   Q.   Did you understand at the time that the

22   CitiMortgage loan did not actually result in a short

23   sale?

24   A.   No.

25   Q.   And when did you first realize that the

# EXHIBIT J

Ally Bank

P.O. Box 725
Midvale, UT 84047

JACALYN ROBBINS
September 13, 2012          REDACTED

1-866-390-1742
Application Number REDACTED 3873
Branch Number 611



We were recently informed by Surf City Auto Group, Inc., 16701 Beach Blvd, Huntington Beach, CA, 92647 that it was considering the credit sale or lease of an automobile or other product to you and asked whether we would be prepared to accept your obligation if the transaction was completed.

We must regretfully inform you that we were not agreeable to handling the proposed transaction as submitted. We would, however, be agreeable to handling the transaction under the modified terms which have been relayed to the dealer.

Our decision was based in whole or in part on information in a report from the credit reporting agency (or agencies) listed below:

Applicant
Equifax          P.O. Box 740241          Atlanta          GA 30374          800-685-1111

You have a right under the Fair Credit Reporting Act to know the information in your credit file at the consumer reporting agency (or agencies). The reporting agency (or agencies) did not make our decision for us and cannot supply specific reasons for our decision. You have a right to a free copy of your report(s) from the consumer reporting agency (or agencies), if you ask no later than 60 days after you receive this notice. If you find that any information in the report(s) you receive is inaccurate or incomplete, you have the right to dispute the matter with the consumer reporting agency (or agencies).

**Information about Your Credit Score**
We also obtained your credit score from Equifax and used it in making our credit decision. Your credit score is a number that reflects the information in your credit report. Your credit score can change, depending on how the information in your credit report changes.
Your credit score: 689
Date: August 23, 2012
Scores range from a low of 250 to a high of 843
Key factors that adversely affected your credit score:
    Serious delinquency (Applicant)
    Time since delinquency is too recent or unknown (Applicant)
    Number of accounts with delinquency (Applicant)
    Length of time accounts have been established (Applicant)
    Inquiries are a key factor (Applicant)



**THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, MARITAL STATUS, AGE (PROVIDED THAT THE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT); BECAUSE ALL OR PART OF THE APPLICANT'S INCOME DERIVES FROM ANY PUBLIC ASSISTANCE PROGRAM; OR BECAUSE THE APPLICANT HAS IN GOOD FAITH EXERCISED ANY RIGHT UNDER THE CONSUMER CREDIT PROTECTION ACT. THE FEDERAL AGENCY THAT ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS CREDITOR IS THE BUREAU OF CONSUMER FINANCIAL PROTECTION, 1700 G STREET NW., WASHINGTON DC 20006.**

You have a right to a statement of specific reasons for our action. To request a statement, please contact us at the above address or telephone number within 60 days of the date of this letter. We will provide you with the statement of reasons within 30 days after receiving your request.

If you contact us, please refer to the Application Number shown above so that we may respond more quickly.

Robbins_0037
509595-02130

1        A.    $19,500.

2        Q.    And if you had instead taken out a loan for the

3    car, do you know what your car payments would have been?

4        A.    I don't recall offhand.  It's on the paperwork.

5        Q.    Okay.

6        A.    I don't know.

7        Q.    Do you have that paperwork still?

8        A.    Yes.

9        Q.    And how long would the car loan have lasted?

10        A.    Four or five years.

11        Q.    And what kind of car did you ultimately

12    purchase?

13        A.    A Jeep.

14        Q.    Is that the same car that you would have

15    purchased had you obtained a loan?

16        A.    Yes.

17             MS. WHITWORTH:  We'll mark this Exhibit G

18    (indicating).

19             (Deposition Exhibit G was marked.)

20    BY MS. WHITWORTH:

21        Q.    How many banks did you apply for loans with for

22    the car?

23        A.    Banks?

24        Q.    Yes.

25        A.    I don't remember.

1          I may have applied to my credit union, but I

2     don't remember.

3          Q.   So how many entities did you apply for credit

4     for a loan for?

5          A.   For sure one, the Surf City Auto Group.

6          Q.   Okay.  And do you recognize the document in

7     front of you (indicating)?

8          A.   Yes.

9          Q.   And what is that?

10         A.   That is a letter from Surf City Auto Group.

11         Q.   And did Surf City Auto Group inform you that the

12    reason that you were unable to obtain a loan was because

13    of the "foreclosure" comment?

14         A.   Surf City, no.

15         Q.   Did you receive any other documents or

16    communications from Surf City regarding the denial of

17    your credit?

18         A.   Yes.

19         Q.   Do you still have those documents?

20         A.   Yes.

21         Q.   And in any of those documents, does Surf City

22    tell you that your loan was denied because of the

23    foreclosure?

24         A.   No.

25         Q.   And in any phone calls, did they ever tell you

# EXHIBIT K

JPMorgan Chase Bank, N.A.
1111 Polaris Parkway
Columbus, OH 43240



REDACTED

003052-01 CAF9 AA 12246-000000000000
JACALYN ROBBINS

REDACTED

September 2, 2012

DEALER: HUNTINGTON BEACH C D J

Dear Applicant,

Thank you for your recent application for vehicle financing with
JPMorgan Chase Bank, N.A. We regret that we are unable to approve your
request for the following reason(s).

FORECLOSURE
UNABLE TO VERIFY RESIDENCE
    Our credit decision was based in whole or in part on information in a
report from the consumer reporting agency(ies) listed below. the reporting
agency(ies) did not make the decision to take the above adverse action and
is unable to provide you with the specific reason(s) why we have denied
credit to you. Under the Federal Fair Credit Reporting Act, you have the
right to obtain a free copy of your consumer report from the consumer
reporting agency(ies) referenced below, if you make your request within
sixty (60) days from the date you receive this notice. You have a right to
dispute with the consumer reporting agency(ies), the accuracy or
completeness of any information in a consumer report furnished by the
agency(ies).

        EQUIFAX CREDIT INFORMATION SERVICES
        P.O. Box 740241
        ATLANTA, GA 30374
        1 (800) 685-1111.

    * SEE REVERSE SIDE FOR IMPORTANT NOTICES *      REDACTED 0560 RTN



EXHIBIT
A 6.28
17
H
Robbins

1    that your loan was denied because of foreclosure?

2        A.    No.

3              Can I clarify?  It was Chase who did the

4    processing.  But I don't know if it's Surf City or Chase,

5    because I didn't apply to Chase.

6        Q.    Okay.

7              MS. WHITWORTH:  Well, let's admit Exhibit H,

8    then (indicating).

9              Maybe we can figure this out.

10             (Deposition Exhibit H was marked.)

11   BY MS. WHITWORTH:

12       Q.    Do you recognize this document (indicating)?

13       A.    Yes.

14       Q.    And what is it?

15       A.    This is a letter from Chase -- JPMorgan Chase

16   Bank --

17       Q.    Do you know --

18       A.    -- on behalf of Huntington Beach Chrysler Dodge

19   Jeep.

20       Q.    Do you know why you received this letter?

21       A.    Yes.

22       Q.    And why was that?

23       A.    I requested -- when you've been denied credit,

24   you're able to request -- you have a right, for details,

25   to request a statement.

# EXHIBIT L

## Preliminary Underwriting Findings

### SUMMARY

| | | | |
|---|---|---|---|
| Preliminary Recommendation | Refer with Caution | | |
| Primary Borrower | Jacalyn L Robbins | Co-Borrower | |
| Lender Loan Number | Unassigned | Casefile ID | REDACTED 0323 |
| Submission Date | 08/28/2014 04:03PM | Submitted By | ll0x7mnw |
| First Submission Date | 08/28/2014 04:03PM | DU Version | 9.1 |
| Submission Number | 1 | | |

### Mortgage Information

| | | | |
|---|---|---|---|
| LTV/CLTV/HCLTV | 75.00% / 75.00% / 75.00% | Note Rate | 4.250% |
| Housing Expense Ratio | 16.46% | Loan Type | Conventional |
| Total Expense Ratio | 42.99% | Loan Term | 360 |
| Total Loan Amount | $472000.00 | Amortization Type | Fixed Rate |
| Sales Price | $0.00 | Loan Purpose | Refinance |
| Appraised Value | $630000.00 | Refi Purpose | Limited Cash-Out |

### Property Information

| | | | |
|---|---|---|---|
| Property Address | REDACTED | Number of Units | 1 |
| | | Occupancy Status | Investment Property |
| Property Type | Detached Condo | | |

### SPECIAL NOTICE

1    This report was created through the Preliminary Findings feature in Desktop Originator (DO) and is provided for informational purposes only.

2    To complete the processing of this loan, you must submit it to a DO sponsoring lender. The loan is not eligible for the Fannie Mae limited waiver of underwriting representations and warranties (as described in the Fannie Mae Selling Guide) until it is submitted to a sponsoring lender.

3    Depending on the underwriting rules and requirements of your sponsoring lender, the recommendation and findings may change upon submission.

### PRELIMINARY RISK/ELIGIBILITY

4    This case does not meet Fannie Mae's eligibility requirements.

5    This loan casefile is ineligible for delivery as a DU loan because it received a Refer with Caution recommendation. However, any loan casefile that receives a Refer with Caution recommendation may be manually underwritten in accordance with the Fannie Mae Selling Guide. Refer to the Selling Guide for additional information.

6    Verify the number of properties being financed. If the borrower will own one to four financed properties, the lender must verify that the borrower meets the reserve requirements for investment or second home transactions as specified in the Selling Guide. If the borrower will own more than four financed properties, the lender must comply with the eligibility, underwriting, and delivery requirements specified in the Selling Guide; and Special Feature Code 150 must be provided when the loan is delivered to Fannie Mae. Cash-out refinance transactions are not eligible if the borrower will own more than four financed properties, unless the loan meets the cash-out exception for delayed financing. If the borrower will own more than ten financed properties, the loan is ineligible for delivery to Fannie Mae.

7    This loan casefile has been underwritten as a limited cash-out refinance. If the originating lender has held the first mortgage being paid off with this transaction for less than six months prior to the disbursement date of the new mortgage loan, the lender must review the short-term financing guidelines and determine whether this transaction is still eligible for delivery to Fannie Mae as a limited cash-out refinance. In addition, the property must not be currently listed for sale. Continuity of obligation, if applicable, must be met. Refer to the Fannie Mae Selling Guide for additional information.

8    This limited cash-out loan casefile was not underwritten according to the DU Refi Plus expanded eligibility guidelines because the subject property was not identified as a Fannie Mae loan that is eligible to be refinanced with DU Refi Plus. Refer to the Selling Guide for additional information regarding why an existing loan may not be eligible to be refinanced using DU Refi Plus.

9    This loan casefile is ineligible for delivery to Fannie Mae because, on high-balance mortgage loans secured by a second home or investment properties, the LTV cannot exceed 65.

10    Desktop Underwriter has identified a foreclosure on the credit report that was reported within the last seven years. This loan is ineligible for delivery to Fannie Mae.

| Borrower | Creditor | Account Number | Date Reported |
|---|---|---|---|
| Jacalyn L Robbins | CITIMORTGAGE INC | REDACTED 1727 | 04/12 |

11    Desktop Underwriter has identified the following account on the credit report as being subject to a preforeclosure sale. The lender must confirm the accuracy of this information. For loan applications taken on or after August 16, 2014, the lender must document that the event was completed four or more years from the disbursement date of the new loan, or two or more years from the disbursement date of the new loan when the lender confirms that the mortgage loan meets the applicable timeframes and eligibility requirements for a preforeclosure sale due to extenuating circumstances, in order for the loan to be eligible for delivery to Fannie Mae. For loan applications taken before August 16, 2014, the lender must document that the loan was completed two or more years from the disbursement date of the new loan, and that the loan complies with all other requirements specific to a preforeclosure sale specified in the Selling Guide in order for the loan to be eligible for delivery to Fannie Mae. If the account was subject to a

11    Desktop Underwriter has identified the following account on the credit report as being subject to a preforeclosure sale. The lender must confirm the accuracy of this information. For loan applications taken on or after August 16, 2014, the lender must document that the event was completed four or more years from the disbursement date of the new loan, and that the mortgage loan meets the applicable timeframes and eligibility requirements for a preforeclosure sale due to extenuating circumstances, in order for the loan to be eligible for delivery to Fannie Mae. For loan applications taken before August 16, 2014, the lender must document that the event was completed two or more years from the disbursement date of the new loan, and that the loan complies with all other requirements specific to a preforeclosure sale specified in the Selling Guide in order for the loan to be eligible for delivery to Fannie Mae. If the account was subject to a foreclosure, the foreclosure must have been completed seven or more years from the disbursement date of the new loan.

| Borrower | Creditor | Account Number |
|----------|----------|----------------|
| Jacalyn L Robbins | NUVISION | REDACTED 1861 |

12    If the foreclosure information on the credit report account below is inaccurate, and the foreclosure was completed seven or more years from the disbursement date of the new loan, or the event was not a foreclosure, the lender may instruct DU to disregard the foreclosure information by entering "Confirmed CR FC Incorrect" in the Explanation field for question c. in the Declarations section and resubmitting the loan casefile to DU. If the foreclosure was the result of extenuating circumstances, and was completed three or more years from the disbursement date of the new loan, the lender may instruct DU to disregard the foreclosure information by entering "Confirmed CR FC EC" in the Explanation field for question c. in the Declarations section and resubmitting the loan casefile to DU.

| Borrower | Creditor | Account Number | Date Reported |
|----------|----------|----------------|---------------|
| Jacalyn L Robbins | CITIMORTGAGE INC | REDACTED 1727 | 04/12 |

## PRELIMINARY FINDINGS

13    The following aspects of the borrower's loan application had a significant adverse impact on the recommendation. Additional information about each of these risk factors can be found in the Lender Guidance For Use With Applicants section of this report:
Debt-to-Income Ratio
Occupancy Type

## PRELIMINARY VERIFICATION MESSAGES/APPROVAL CONDITIONS

14    This loan is also subject to all other lender specified conditions and must comply with all applicable federal, state, and local laws and regulations.

15    Based on the credit report obtained through Desktop Underwriter, this loan casefile must close on or before 12/28/2014. All credit documents must be no more than four months old on the date the note is signed. For guidelines on the age of the appraisal or property inspection report, refer to the Fannie Mae Selling Guide.

16    If there is an existing rental agreement or lease on the subject property, verify that it does not contain any provisions that could affect Fannie Mae's first lien position on the property. Review the lease to determine if it is subordinated to the new first mortgage. If it will not be subordinate to the new mortgage, ensure that any tenant's rights to the property have been formally waived by the tenants.

17    If there is a home equity line of credit secured against the subject property the maximum allowable HCLTV is 65 percent and the terms of the home equity line of credit must be verified for compliance with the Fannie Mae Selling Guide. The HCLTV calculation is based on the maximum credit limit of the equity line.

18    The Adverse Market Delivery Charge will be applied when this mortgage loan is delivered to Fannie Mae, along with any applicable loan-level price adjustments. Refer to the Selling Guide and Loan-level Price Adjustment (LLPA) Matrix and Adverse Market Delivery Charge (AMDC) Information on efanniemae.com for specific details.

### Preliminary Credit and Liabilities

19    With the exception of 30-day accounts, evidence of payoff of the following debts must be included in the loan file.

| Borrower | Creditor | Account Number | Balance |
|----------|----------|----------------|---------|
| Jacalyn L Robbins | CITIMORTGAGE INC | REDACTED 3377 | 467229.00 |

### Preliminary Employment and Income

20    Perform and document a verbal verification of employment for each borrower within 10 business days prior to the note date for all borrowers not using self-employment income for qualifying, and within 30 calendar days prior to the note date for all borrowers using self-employment income for qualifying. For borrowers with military income, a military Leave and Earnings Statement (LES) dated within 31 calendar days prior to the note date is acceptable in lieu of a verbal verification of employment. Lenders also have the option of obtaining the verbal verification of employment after the note date (and prior to delivery of the loan to Fannie Mae), but when using this option must ensure compliance with the Fannie Mae Selling Guide.

21    Obtain a completed and signed Form 4506-T for all borrowers at or before closing. Form 4506 or Form 8821 may be used in lieu of Form 4506-T. Refer to the Fannie Mae Selling Guide for additional alternatives.

22    Calculate and document the net cash flow on the subject property according to the Fannie Mae Selling Guide. If the borrower is being qualified with the entire payment, without benefit of rental income, rental income documentation for the subject property is not required for qualifying purposes. However, the lender must report the monthly rent at delivery. Refer to the Fannie Mae Selling Guide for permissible sources for obtaining monthly rent for reporting purposes.

23    Jacalyn L Robbins's income, including bonus and/or overtime income, must be supported by a paystub and W-2s covering the most recent two-year period, or by a standard Verification of Employment (1005). The paystub must be dated no earlier than 30 days prior to the initial loan application date and it must include all year-to-date earnings. Additionally, the paystub must include sufficient information to appropriately calculate income; otherwise, additional documentation must be obtained. If a standard Verification of Employment (1005) will be obtained it must include all year-to-date earnings, as well as prior-year earnings if a W-2 is not being provided. For guidance on borrowers with less than a two-year history of receiving income, or for any additional information on the verification of bonus income, refer to the Selling Guide.

23   Jacalyn L Robbins's income, including bonus and/or overtime income, must be supported by a paystub and W-2s covering the most recent two-year period. The most current paystub must be dated no earlier than 30 days prior to the initial loan application date and it must include all year-to-date earnings. Additionally, the paystub must include sufficient information to appropriately calculate income; otherwise, additional documentation must be obtained. If a standard Verification of Employment (1005) will be obtained it must include all year-to-date earnings, as well as prior year earnings if a W-2 is not being provided. For guidance on borrowers with less than a two-year history of receiving bonus income, or for any additional information on the verification of bonus income, refer to the Selling Guide.

## Preliminary Assets

24   Assets totaling $69000 must be verified. From the liquid assets listed on the 1003, at a minimum verify those accounts that are needed to satisfy this amount. Based on the transaction, there may be additional reserve requirements that must be manually applied by the lender. Refer to the Fannie Mae Selling Guide for additional information.

25   The value entered for the stock or bond account(s) should be 70 percent of the value of the account if the funds will be used as reserves. If these assets are needed to support the amount of funds required for reserves, document the value with a current brokerage account statement or a photocopy of the certificate or bond accompanied by a dated newspaper list. For loan casefiles that are not underwritten as DU Refi Plus, if the funds will be used for the down payment or closing costs, receipt of the funds realized from the sale or liquidation of the assets must be verified. Vested stock options are not an acceptable source for reserves. Non-vested stock options are not an acceptable source of funds for the down payment, closing costs, or reserves.

## Preliminary Property and Appraisal Information

26   Obtain a comparable rent schedule on Form 1007. If the borrower is being qualified with the entire payment, without benefit of rental income, Form 1007 is not required.

27   Desktop Underwriter returned the following standardized address and census tract for the subject property: ██████████████████████████ 92656-3314, 062640. This is the address that Desktop Underwriter used in its property valuation and fieldwork recommendation. Regardless of the property fieldwork required by Desktop Underwriter, if this address is not valid for the subject property, an appraisal based on an interior and exterior property inspection reported on Form 1004 is required for this transaction. If the subject property is located in a condominium project, the appraisal must be reported on Form 1073.

28   This detached property is located in a condominium project. Perform a limited review according to the Fannie Mae Selling Guide. All occupancy types for detached condominiums are eligible for a limited review in Desktop Underwriter. If the property is located in a state in which specific project review type guidelines apply, the lender must confirm the loan casefile complies with those guidelines. Refer to the Selling Guide for additional information.

29   An appraisal based on an interior and exterior property inspection reported on Form 1073 is required for this condominium refinance transaction. However, if the condominium project consists solely of detached dwellings, Form 1004 may be used, though the appraiser must include an adequate description of the project and information about the homeowners' association fees and the quality of the project maintenance.

30   This loan casefile was underwritten according to the guidelines outlined for high-balance mortgage loans and must meet all the terms and conditions specified in the Selling Guide. Based on the subject property data entered, DU determined that the subject address is located within the county of ORANGE COUNTY and used the corresponding high-cost area loan limit of $625500.00.

31   Form 1004MC must be completed for any transaction on which an appraisal is obtained. Refer to the Fannie Mae Selling Guide for additional information.

## Preliminary Ratio Information

32   This loan casefile has been underwritten as a second home or investment property transaction. DU captures data from Section VI L to calculate the debt-to-income ratio. The debt-to-income ratio will not be accurate unless the borrowers' total monthly principal residence housing expense, which includes principal, interest, hazard insurance, real estate taxes, mortgage insurance, and homeowners' association dues, is accounted for in the Liabilities section.

## PRELIMINARY OBSERVATIONS

33   This case was submitted to Desktop Underwriter version 9.1 by ---. The following information is associated with this loan: Casefile ID is [REDACTED]0323 and Submission number is 1. If the loan is delivered to Fannie Mae, the Casefile ID must be provided at delivery.

34   The following list of special feature codes is provided to assist you in determining which codes may be associated with this loan. Other codes may be required. Refer to the Fannie Mae Selling Guide for a comprehensive list.

| Special Feature Code | Description |
| --- | --- |
| 588 | Detached Condominium |
| 808 | High-Balance Mortgage Loan |
| 127 | DU Loan |
| 007 | Limited Cash-out Refinance |

35   The following Credit Report information is associated with this submission:

| Borrower Name | Credit Agency | Credit Report ID | Credit Report Date |
| --- | --- | --- | --- |
| Jacalyn L Robbins | Informative Research | [REDACTED]252PQ | 08/28/2014 |

36   The following credit scores were obtained by the credit agency selected by the user and are included in the credit report:

| Borrower | Credit Scores |
| --- | --- |
| Jacalyn L Robbins | 704 723 727 |

37   The following sources of income were used in the underwriting analysis:

36    The following credit scores were obtained by the credit agency selected by the user and are included in the credit report:

| Borrower | Credit Scores |
|----------|---------------|
| Jacalyn L Robbins | REDACTED 727 |

37    The following sources of income were used in the underwriting analysis:

| Borrower | Income Type | Amount |
|----------|-------------|--------|
| Jacalyn L Robbins | Bonuses | 755.00 |
| Jacalyn L Robbins | Base employment income | 10998.00 |

38    The following assets were counted towards available funds. With the exception of cash on hand, all available funds greater than the amount required to close have been added to cash reserves.

| Borrower | Asset Type | Institution Name | Amount |
|----------|-----------|------------------|--------|
| Jacalyn L Robbins | Stock | IRA | 69000.00 |

39    Desktop Underwriter does not include cash back received from the transaction in the borrower's cash reserves calculation. Therefore, the amount of cash back, $475.33, has not been included in cash reserves.

## PRELIMINARY LENDER GUIDANCE FOR USE WITH APPLICANTS

40    Expense Ratio: A high debt-to-income (total expense) ratio suggests that it may be difficult for the borrower to make the monthly mortgage payment in a timely manner.

41    Occupancy: Investment properties and second homes represent a higher level of risk because these occupancy types experience higher default rates than primary residences.

42    The Lender Guidance For Use With Applicants messages are for the lender's use in consulting with the borrower regarding the factors that contributed to the underwriting recommendation. The Underwriting Findings do not constitute a credit decision, and the messages are not intended to and may not be used to satisfy the lender's regulatory obligations in connection with its credit decision, including any obligation to provide an adverse action notice or reasons for adverse action.

## TRADEMARK

43    Desktop Originator is a registered trademark of Fannie Mae. DO is a trademark of Fannie Mae.

# Underwriting Analysis Report

| Preliminary Recommendation | Refer with Caution | | |
|----------------------------|--------------------|--|--|
| Primary Borrower | Jacalyn L Robbins | Co-Borrower | |
| Lender Loan Number | Unassigned | Casefile ID | REDACTED 0323 |
| Submission Date | 08/28/2014 04:03PM | Submitted By | 110x7mnw |

## PROPERTY INFORMATION

| Property Address | REDACTED | Number of Units | 1 |
|------------------|----------|-----------------|---|
| Property Type | Detached Condo | Occupancy Status | Investment Property |

## MORTGAGE INFORMATION

| Loan Type | Conventional | LTV/CLTV/HCLTV | 75.00% / 75.00% / 75.00% |
|-----------|--------------|----------------|--------------------------|
| Amortization Type | Fixed Rate | Loan Amount | $472000.00 |
| Balloon | No | Financed MI Amount | $0.00 |
| Community Lending | No | Total Loan Amount | $472000.00 |
| Payment Frequency | Monthly | Sales Price | $0.00 |
| Lien Type | First Mortgage | Appraised Value | $630000.00 |
| Amt. Subordinate Fin. | $0.00 | P&I | $2321.96 |
| Loan Purpose | Refinance | Note Rate | 4.250% |
| Refi Purpose | Limited Cash-Out | Qualifying Rate | 4.250% |
| Owner Existing Mtg. | | Bought Down Rate | 0.00% |
| Buydown | No | Term (Months) | 360 |

## INCOME

| | | | |
|--|--|--|--|
| Base | $10998.00 | | |
| Commission | $0.00 | | |
| Bonus | $755.00 | | |
| Overtime | $0.00 | | |
| Other | $0.00 | | |
| Positive Net Rental | $0.00 | | |
| Subj. Pos. Cash Flow | $0.00 | | |
| Total | $11753.00 | | |

## QUALIFYING RATIOS

| | |
|--|--|
| Housing Expense | 16.46% |
| Total Expense | 42.99% |

## EXPENSE RATIOS

| | |
|--|--|
| Including ≤ 10 Mos. | 42.99% |
| With Undisclosed Debt | 42.99% |

## PROPOSED MONTHLY PAYMENT

| | | | |
|--|--|--|--|
| First P&I (Qualifying) | $2321.96 | Negative Net Rental | $0.00 |
| Second P&I | $0.00 | Subj. Neg. Cash Flow | $2999.22 |

Robbins_0107

## PROPOSED MONTHLY PAYMENT

| | | | |
|---|---|---|---|
| First P&I (Qualifying) | $2321.96 | Negative Net Rental | $0.00 |
| Second P&I | $0.00 | Subj. Neg. Cash Flow | $2999.22 |
| Hazard Insurance | $35.00 | All Other Payments | $119.00 |
| Taxes | $457.26 | Total Expense Payment | $5053.22 |
| Mortgage Insurance | $0.00 | | |
| HOA Fees | $185.00 | Present/Principal Housing Payment | $1935.00 |
| Other | $0.00 | | |
| Total Housing Payment | $2999.22 | | |

## FUNDS

| | | | |
|---|---|---|---|
| Total Available Assets | $69000.00 | Cash Back | $475.33 |
| Funds Required to Close | $0.00 | Net Cash Back | $475.33 |
| Reserves Required to be Verified | $69000.00 | Excess Available Assets, not required to be verified by DU | $0.00 |
| Total Funds to be Verified | $69000.00 | | |

**The Preliminary Recommendation for this case is: Refer with Caution**

Copyright (c) 1994-2014 Fannie Mae

# EXHIBIT M



Informative
RESEARCH

13030 EUCLID STREET
STE. 100
GARDEN GROVE, CA 92843
800-676-3338
informativeresearch.com

| | | | |
|---|---|---|---|
| Attention: | Fernando | Report Type: | Merged Credit Report |
| Client Name: | ARCSTONE FINANCIAL INC | Sources: | XPN TU EFX |
| Client ID: | REDA 7205 | Order Number: | REDACTED 52PQ |
| Loan Number: | ▆▆▆▆ | Original Order Number: | |
| First Issued: | 08/28/2014 10:27 AM | Product Price: $9.00   Other: $7.20   Total: $16.20 | |
| Last Updated: | 08/28/2014 10:27 AM | | |

**Borrower Information**

| | | | |
|---|---|---|---|
| Borrower: | Jacalyn L Robbins | Co-Borrower: | |
| Borrower SSN: | ▆▆▆-5740 | Co-Borrower SSN: | |
| Borrower DOB: | ▆▆▆▆ | Co-Borrower DOB: | |
| Current Address: | REDACTED | | |

**Credit Scores**

JACALYN ROBBINS                723                 XPN Fairlsaac (V2)
- 39   Serious delinquency
- 6   Number of finance company accounts
- 2   Delinquency reported on accounts
- 18   Number of accounts delinquent

JACALYN L ROBBINS              727                 TU FICORiskScoreClassic04
- 39   Serious delinquency
- 13   Time since delinquency is too recent or unknown

JACALYN L ROBBINS              704                 EFX FACTABeacon5.0
- 39   Serious delinquency
- 13   Time since delinquency is too recent or unknown
- 18   Number of accounts with delinquency
- 14   Length of time accounts have been established



EXHIBIT 3
Ludes
8-4-17
PENGAD 800-631-6989

4044818252PQ                                                           Page 1 of 9

| Trade Lines | | | | | | | | | |
| Creditor Name | Reported Date | Opened Date | Balance | Payment | Terms | Account Type | Times Past Due | | |
| Account Number | DLA | ECOA | Credit Limit | High Credit | Current Status | Months Reviewed | 30 | 60 | 90+ |
| CITIMORTGAGE INC | 07/14 | 08/07 | 467229 | | 2004 | 360 MO | Mtg | | |
| REDACTED 3377 | 07/14 | B | | 492000 | | 01 | 77 | 0 | 0 | 0 |

Conventional Real Estate Mortgage

XPN1 TU1 EFX1

07/14: CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: OPEN ACCOUNT
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
EFX1: REAL ESTATE MORTGAGE
EFX1: CONVENTIONAL MORTGAGE

| CHASE | 08/14 | 06/05 | 4853 | | 103 | REV | Rev | | |
| REDACTED 2133 | 08/14 | B | 25925 | 9852 | | 01 | 99 | 0 | 0 | 0 |

Credit Card

XPN1 TU1 EFX1

08/14: CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: OPEN ACCOUNT
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
EFX1: AMOUNT IN H/C COLUMN IS CREDIT LIMIT
EFX1: FLEXIBLE SPENDING CREDIT CARD

| AMEX | 08/14 | 03/01 | 323 | | 16* | REV | Rev | | |
| REDACTED 833 | 08/14 | B | 16100 | 590 | | 01 | 48 | 0 | 0 | 0 |

Credit Card

XPN1 TU1 EFX1

08/14: CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: OPEN ACCOUNT
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: CREDIT CARD, TERMS REV
EFX1: CREDIT CARD
EFX1: AMOUNT IN H/C COLUMN IS CREDIT LIMIT

| ABN AMRO MORTGAGE GROU | 03/08 | 08/07 | 0 | | | PAID | Mtg | | |
| REDACTED 43377 | 03/08 | B | | 492000 | | 01 | 4 | 0 | 0 | 0 |

Conventional Real Estate Mortgage

XPN1 TU1 EFX1

03/08: CCC

XPN1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
TU1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
EFX1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
EFX1: REAL ESTATE MORTGAGE

16-cv-4732 LHK

Robbins_0092

| Creditor Name | Reported Date | Opened Date | Balance | Payment | Terms | Account Type | Times Past Due | | |
|---|---|---|---|---|---|---|---|---|---|
| Account Number | DLA | ECOA | Credit Limit | High Credit | Current Status | Months Reviewed | 30 | 60 | 90+ |
| AMEX | 06/08 | 04/01 | 0 | | REV | Rev | | | |
| REDACTED 0883 | 06/08 | B | 13200 | 13200 | 01 | 48 | 0 | 0 | 0 |
| CreditCard | | | | | | | | | |

XPN1 TU1 EFX1

06/08: -CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CONSUMER
XPN1: ACCOUNT/PAID SATISFACTORILY
XPN1: CREDIT CARD, TERMS REV
TU1: CREDIT LINE CLOSED BY CUSTOMER
EFX1: ACCOUNT CLOSED BY CONSUMER
EFX1: PAID ACCOUNT, ZERO BALANCE

| AMEX DSNB | 07/14 | 01/07 | 0 | | REV | Rev | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED 0831 | 03/14 | B | 300 | 300 | 01 | 89 | 0 | 0 | 0 |
| CreditCard | | | | | | | | | |

TU1 XPN1 EFX1

07/14: -CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CONSUMER
XPN1: ACCOUNT/PAID SATISFACTORILY
XPN1: CREDIT CARD, TERMS REV
TU1: CREDIT LINE CLOSED BY CUSTOMER
EFX1: ACCOUNT CLOSED BY CONSUMER
EFX1: PAID ACCOUNT, ZERO BALANCE

| BK OF AMER | 11/07 | 06/97 | 0 | | REV | Rev | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED 1198 | 11/07 | B | 15000 | 15000 | 01 | 99 | 0 | 0 | 0 |
| CreditCard | | | | | | | | | |

XPN1 EFX1

11/07: -------------C---------

XPN1: CLOSED ACCOUNT
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CONSUMER
EFX1: ACCOUNT CLOSED BY CONSUMER
EFX1: CREDIT CARD

| Creditor Name | Reported Date | Opened Date | Balance | Payment | Terms | Account Type | Times Past Due | | |
|---|---|---|---|---|---|---|---|---|---|
| Account Number | DLA | ECOA | Credit Limit | High Credit | Current Status | Months Reviewed | 30 | 60 | 90+ |
| CAP1/NEIMN | 11/06 | 07/95 | 0 | | REV | Rev | | | |
| REDACTED 0794 | 11/06 | B | 0 | 579 | 01 | 29 | 0 | 0 | 0 |

CreditCard

XPN1

11/06: -CCCCCCCCCCCCCCCCCCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT/PAID SATISFACTORILY

| CHASE | 11/05 | 06/99 | 0 | | REV | Rev | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED 2922 | 11/05 | B | 525 | 5993 | 01 | 53 | 0 | 0 | 0 |

CreditCard

XPN1 TU1 EFX1

11/05: -CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CONSUMER
XPN1: ACCOUNT/PAID SATISFACTORILY
TU1: CREDIT LINE CLOSED BY CUSTOMER
EFX1: ACCOUNT CLOSED BY CONSUMER
EFX1: PAID ACCOUNT, ZERO BALANCE

| CITIBANKNA | 01/08 | 01/07 | 0 | | PAID | Mtg | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED 9926 | 11/07 | B | 172000 | 172000 | 01 | 12 | 0 | 0 | 0 |

HomeEquity

TU1 XPN1 EFX1

01/08: -CCCCCCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT/PAID SATISFACTORILY
TU1: CLOSED ACCOUNT
EFX1: PAID ACCOUNT, ZERO BALANCE
EFX1: HOME EQUITY LOAN

4044618252PQ

Page 4 of 9

| Trade Lines | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Creditor Name | Reported Date | Opened Date | Balance | Payment | Terms | Account Type | Times Past Due | | |
| Account Number | DLA | ECOA | Credit Limit | High Credit | Current Status | Months Reviewed | 30 | 60 | 90+ |
| DSNB BLOOM | 08/14 | 01/07 | 0 | | REV | Rev | | | |
| REDACTED 5202 | 04/14 | B | 100 | 716 | 01 | 91 | 0 | 0 | 0 |

CreditCard

TU1 XPN1 EFX1

08/14: -CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC--CCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CONSUMER
XPN1: ACCOUNT/PAID SATISFACTORILY
TU1: CREDIT LINE CLOSED BY CUSTOMER
EFX1: ACCOUNT CLOSED BY CONSUMER
EFX1: PAID ACCOUNT, ZERO BALANCE

| MORTGAGE SERVICE CENTE | 05/08 | 03/03 | 0 | | PAID | Mtg | | | |
|---|---|---|---|---|---|---|---|---|---|
| REDACTED 0930 | 05/08 | B | | 238240 | 01 | 60 | 0 | 0 | 0 |

ConventionalRealEstateMortgage

XPN1 TU1 EFX1

05/08: -CCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCCC-CCC--C--CC

XPN1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
TU1: ACCOUNT TRANSFERRED TO ANOTHER LENDER
EFX1: FANNIE MAE ACCOUNT
EFX1: ACCOUNT TRANSFERRED TO ANOTHER LENDER

| SEARS/CBNA | | 04/10 | 09/03 | 0 | | REV | Rev | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED 0888 | | 03/09 | B | 7200 | 7200 | 01 | 78 | 0 | 0 | 0 |

CreditCard

EFX1 XPN1

04/10: --------CCCCCCCCCCCCCCCCCCCCCCCCC

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CONSUMER
XPN1: ACCOUNT/PAID SATISFACTORILY
EFX1: ACCOUNT CLOSED BY CONSUMER
EFX1: PAID ACCOUNT, ZERO BALANCE

16-cv-4732 LHK                                    Robbins_0095

| Trade Lines | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Creditor Name | Reported Date | Opened Date | Balance | Payment | Terms | Account Type | Times Past Due | | | |
| Account Number | DLA | ECOA | Credit Limit | High Credit | Current Status | Months Reviewed | 30 | 60 | 90+ |
| UNVL/CITI | 09/05 | 01/02 | 0 | | REV | Rev | | | |
| REDACTED1586 | 09/05 | B | 8000 | 6283 | 01 | 44 | 0 | 0 | 0 |
| CreditCard | | | | | | | | | |

XPN1

09/05: -CCCCCCCCCCCCCCCCCCCC----

XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: THIS IS AN ACCOUNT IN GOOD STANDING
XPN1: ACCOUNT CLOSED BY CREDIT GRANTOR
XPN1: ACCOUNT/PAID SATISFACTORILY

| Derogatory Trade Lines |
|---|
| None Reported |



| Collections | | | | | | |
|---|---|---|---|---|---|---|
| Collection Agency | Reported Date | Opened Date | Balance | Payment | Account Type | Current Status |
| Account Number | DLA | ECOA | Credit Limit | High Credit | Terms | Months Reviewed |
| Original Creditor | | | | | | |
| CITIMORTGAGE INC | 05/12 | 03/03 | 0 | | Mtg | 09 |
| REDACTED1727 | 05/12 | B | | 238240 | PAID | 49 |



XPN1 TU1 EFX1

XPN1: PREVIOUS STATUS 08
XPN1: PAID ACCOUNT, ZERO BALANCE
XPN1: FORECLOSURE PROCEDURE STARTED
XPN1: 65
TU1: FORECLOSURE PROCEEDING DISCONTINUED
EFX1: FANNIE MAE ACCOUNT
EFX1: ACCOUNT PAID AFTER FORECLOSURE STARTED

| | | | | | | |
|---|---|---|---|---|---|---|
| NUVISION | 06/12 | 11/07 | 0 | | Mtg | 09 |
| REDACTED1861 | 05/12 | B | | 163000 | PAID | 55 |

EFX1 XPN1

XPN1: ACCOUNT LEGALLY PAID IN FULL FOR LESS THAN THE FULL BALANCE
XPN1: ACCOUNT LEGALLY PAID IN FULL FOR LESS THAN THE FULL BALANCE
EFX1: SETTLED ACCOUNT
EFX1: PAID CHARGE OFF

| Public Records |
|---|
| None Reported |

| Inquiries | | |
|---|---|---|
| ARCSTONE FINANCIAL I FINANCE | 08/20/14 | TU1 |

| Addresses | | | | |
|-----------|--------|------|---------------|----------------|
| Address | Status | ECOA | Reported Date | Repository |
| REDACTED | Current | B | | |
| | Current | B | 06/14 | XPN1 |
| | Prior | B | 09/12 | XPN1 EFX1 |
| | Prior | B | 10/10 | XPN1 TU1 EFX1 |
| | Current | B | 07/12 | TU1 |
| | Prior | B | | TU1 EFX1 |

| Employment | | | | |
|------------|-------------------|---------|------------------|---------------|
| Name | Employer Position | Status | Reported Date | Repository |
| JACALYN ROBBINS | US TECHNOLIGY | Current | 09/07 | XPN1 |
| JACALYN ROBBINS | US TECHNOLOGY | Prior | 12/06 | XPN1 TU1 |
| JACALYN L ROBBINS | MICROSOFT PRODUCT MANAGER | Current | 08/12 | TU1 EFX1 |
| JACALYN L ROBBINS | BANANA REPUBLIC | Prior | | EFX1 |

## Information and Alerts

**XPN1**
OFAC: (Clear) SUBMISSION OF OFAC REQUEST RETURNED NO RESULTS (XPN1)
FACTA: Address Discrepancy - Reported via A/R tape, but different from inquiry

DOB: ▓▓▓▓▓▓▓▓▓▓

**TU1**
FACTA: Address Discrepancy - Current Address Input does not match fileTU
HIGH RISK FRAUD ALERT: (5504) Input SSN ISSUED: 1978 TO 1979 STATE: OR; (EST.AGE OBTAINED: 15 TO 17)(TU)

DOB: ▓▓▓▓▓▓▓▓▓▓
AKA: JACI ROBBINS

**EFX1**
FACTA: Address Discrepancy - A substantial difference occurred

DOB: ▓▓▓▓▓▓ age: 52

## Consumer Statements

None Reported

4044818252PQ

Page 7 of 9

## Summary

| | Borrower |
|---|---|
| Number of Trades Reported | 16 |
| Number of Open trades | 3 |
| Number of Trades w/Balance | 3 |
| Number of Inquiries last 120 days | 1 |
| Number of Delinquent Trades | 2 |
| Number of 30 Day Mortgage Delinquencies | 0 |
| Number of 60 Day Mortgage Delinquencies | 0 |
| Number of 90 Day Mortgage Delinquencies | 0 |
| Installments - Monthly Payments | $2,304 |
| Installments - Outstanding Balance | $467,229 |
| Revolving - Monthly Payments | $119 |
| Revolving - Outstanding Balance | $5,176 |
| Mortgage - Monthly Payments | $2,304 |
| Mortgage - Outstanding Balance | $467,229 |

## Creditor Information List

| Creditor Name | Phone Number | Street Address | City, State Postal Code |
|---|---|---|---|
| ABN AMRO MORTGAGE GR OU | 8007838900 | 2600 W BIG BEAVER RD | TROY, MI 48084 |
| AMEX | 8008742717 | PO BOX 297871 | FORT LAUDERDALE, FL 33329 |
| ARCSTONE FINANCIAL I | | 13030 EUCLID ST | GARDEN GROVE, CA 92843 |
| BK OF AMER | 8004212110 | POB 17054 | WILMINGTON, DE 19884 |
| BLOOM/DSNB | 8009500339 | 9111 DUKE BLVD | MASON, OH 45040 |
| CHASE | 8009559900 | 800 BROOKSEDGE BLVD | WESTERVILLE, OH 43081 |
| CHASE | 8009559900 | 800 BROOKSEDGE BLVD | WESTERVILLE, OH 43081 |
| CITIBANKNA | 8006850935 | 1000 TECHNOLOGY DR # MS5 | O FALLON, MO 63368 |
| CITIMORTGAGE INC | 8002837918 | PO BOX 9442 | GAITHERSBURG, MD 20898 |
| DSNB BLOOM | 8009500339 | 9111 DUKE BLVD | MASON, OH 45040 |
| FIRST TECH FCU | 8772334766 | 3408 HILLVIEW AVE | PALO ALTO, CA 94304 |
| MORTGAGE SERVICE CEN TE | 8003300423 | 4001 LEADENHALL RD | MOUNT LAUREL, NJ 08054 |
| NCCINC/HUNTINGTON BE AC | 7148413999 | 16701 BEACH BLVD | HUNTINGTON BEACH, CA 92647 |
| NUVISION | 7143758000 | 7812 EDINGER AVE | HUNTINGTON BEACH, CA 92647 |
| SEARS/CBNA | BYMAILONLY | PO BOX 6189 | SIOUX FALLS, SD 57117 |
| UNVL/CITI | BYMAILONLY | PO BOX 6241 | SIOUX FALLS, SD 57117 |

## PreCloseCredit Report

To order a PreCloseCredit Report for this report, Click Here .

For more information about Informative Research's PreCloseCredit Report, Click Here .

## Derogatory Worksheet

To order a Derogatory Worksheet for this report, Click Here .

For more information about Informative Research's Derogatory Worksheet, Click Here .

## PreClose Monitoring Report

To order a PreClose Monitoring Report for this report, Click Here .

For more information about Informative Research's PreClose Monitoring Report, Click Here .

### Credit Data Repository Information

| Repository Name | Phone Number | Street Address | City, State Postal Code |
|---|---|---|---|
| Experian | (800) 509-8495 | P.O. Box 9701 | Allen, TX 75013 |
| TransUnion | (800) 888-4213 | P.O. Box 1000 2 Baldwin Place | Chester, PA 19022 |
| Equifax Credit Infor mation | (800) 685-1111 | P.O. Box 740256 | Atlanta, GA 30374 |

**\*Payment Note**

The monthly payment amount(s) are calculated at 5 percent of the balance or at the pre-determined minimum amount of $10, whichever is greater. For AMEX Accounts, the monthly payment amount(s) are calculated at 5 percent of the balance or at the pre-determined minimum amount of $10, whichever is greater.

**Disclaimer**

This credit report contains data from the identified repositories. The contents have not been verified and the report may contain duplicate information. The credit report may be used for real estate lending purposes; however, it is not a residential mortgage credit report (RMCR) as currently defined by FHA, FMHA, VA, Fannie Mae and Freddie Mac guidelines. IR merge version(s) may impact your Pre-Close Credit Report values. Contact Informative Research HelpDesk with questions. IR Blend V 2.2.33.0r

```
*******************************************************
              End of Report - 08/28/2014 10:27 AM
*******************************************************
```

16-cv-4732 LHK

Robbins_0099

1      Q.   I should have told you that you can ask for

2  a break.

3      A.   You're nice.  I'm fine.  Thank you.

4      Q.   Okay.  Let's mark this exhibit.  Are we on

5  3?

6           THE REPORTER:  Yes.

7           MS. WHITWORTH:  3.

8           (Whereupon, the document referred

9           to was marked as Exhibit 3 by the

10          court reporter and is hereto

11          attached.)

12  BY MS. WHITWORTH:

13     Q.   Do you recognize this document?

14     A.   It looks familiar.

15     Q.   And what is your understanding of what this

16  document is?

17     A.   It's a credit report.

18     Q.   Is this the report that you received when

19  investigating whether Ms. Robbins would qualify for

20  a refinance?

21     A.   I believe it is.

22     Q.   And is this the report that would have been

23  submitted to Fannie and Freddie to determine whether

24  she qualified for a refinance?

25     A.   Yes.